DAVID D. LESHNER
First Assistant United States Attorney
AARON P. ARNZEN (CA Bar No. 218272)
ANDREW J. GALVIN (CA Bar No. 261925)
Assistant United States Attorneys
Federal Office Building
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone: (619) 546-8384 / 9721
Email: Aaron.Arnzen@usdoj.gov / Andrew.Galvin@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 20CR2115-LAB |
| Plaintiff, | |
| v. | **UNITED STATES' SENTENCING MEMORANDUM** |
| GINA CHAMPION-CAIN, | |
| Defendant. | |

The UNITED STATES OF AMERICA, by and through its counsel, David D. Leshner, First Assistant United States Attorney, and Aaron P. Arnzen and Andrew J. Galvin, Assistant United States Attorneys, hereby submits its sentencing memorandum as to Defendant Gina Champion-Cain.

## I.

## INTRODUCTION

Gina Champion-Cain ran the largest known Ponzi scheme in the history of this District. She did so by convincing investors that she would use their money to make loans to individuals and entities attempting to purchase California liquor licenses. From 2012 – 2019, hundreds of millions of dollars flowed into the scheme based on Defendant's false statements to investors that, among other things, she would use their money to fund these loans; the investors' money would be safe in an escrow holding account; and the invested

funds would and could only be returned to the specific investor who deposited the funds or his/her intermediary.

Defendant knew these representations and omissions were false. She never used the funds to make liquor license loans. Instead, Defendant and her co-conspirators simply used investor funds to pay back other investors whose investments would soon be redeemed, and embezzled funds to support her other businesses (some of which were failing) and her lifestyle. Defendant and her co-conspirators succeeded in defrauding investors by, among other things, fabricating documents, forging signatures, and telling investors lies through fake email accounts so that when investors attempted to double-check on their investments with third parties, they were often really communicating with Defendant or her employees. And when Defendant and her co-conspirators learned of a government investigation into her scheme, they destroyed evidence that they knew was incriminating.

For her crimes, Defendant should be sentenced to 130 months in custody.

## II.
## STATEMENT OF FACTS

**A. Defendant And Her Position In The San Diego Business Community**

Defendant was a long-time, successful and highly-regarded member of San Diego's business community. She was the founder and CEO of American National Investments, Inc. ("American National Investments"), a real estate development company and the parent company of a large number of small businesses, which operated primarily in the real estate, retail, and restaurant sectors. She gave periodic interviews to local media about the business environment and industry trends in San Diego. She was also known for her philanthropy and civic activity, to such an extent that a former San Diego mayor reserved June 28th as "Gina Champion-Cain Day" to recognize her role in the business community. Defendant enjoyed this status until an investigation by the United States Securities and Exchange Commission (SEC) revealed in 2019 that Defendant had masterminded an enormous, years-long, fraudulent scheme. *See generally* PSR, ¶¶ 104-113.

### B. Defendant Identifies A Potential Investment Opportunity

Defendant acquired interests in, and managed and controlled, several San Diego restaurants, including the well-known *Patio* restaurant chain. In that role, Defendant gained an understanding of how California liquor licenses were (and still are) transferred - under California law, a buyer seeking to obtain a liquor license from an existing licensee must submit an application to the California Department of Alcoholic Beverage Control (the "ABC"). While the application is pending, the buyer/applicant must place in an escrow account an amount of money equal to the purchase price of the license. *See* Plea Agreement, ¶¶ 8-9.

Defendant spotted a way to raise money from investors based on this escrow requirement. She could reasonably represent to prospective investors that many liquor license applicants (1) did not have sufficient funds to deposit the license's full purchase price in an escrow account for an extended period of time, and (2) were therefore willing to pay high interest rates on short-term loans that would fund the escrow accounts. Having hatched this idea, Defendant gave life to a Ponzi scheme that grew into the largest of its kind in the history of this District. *Id.* at ¶ 10.

### C. Defendant Solicits Investments In The Purported Lending Program

Beginning at least as early as 2012, Defendant told Investor 1, a wealthy San Diego businessman, about a supposedly lucrative investment opportunity surrounding liquor license escrow accounts (the "Lending Program"). Defendant represented that she had a list of liquor license applicants who sought to borrow money to fund escrow accounts associated with liquor license transactions. Investor 1's money would be safe, according to Defendant, because it would be maintained pursuant to an escrow agreement in an escrow account held at a well-known financial services company (the "Escrow Company"). *Id.*, ¶¶ 10-11.

Defendant told Investor 1 that the escrow agreement was favorable to him because the escrowed funds could only be withdrawn by Investor 1 after the ABC accepted or

declined the corresponding transfer application, and the funds would not and could not be disbursed to any other parties. Between approximately 2012 and 2019, and relying on Defendant's representations, Investor 1 invested tens of millions of dollars into this Lending Program. *Id.*

Defendant's scheme was not confined to Investor 1. Instead, Defendant encouraged Investor 1 to solicit other investors. With Defendant's knowledge, Investor 1 passed on Defendant's representations to many other individual and entity investors, who collectively invested tens of millions of additional dollars directly and indirectly in the Lending Program. Defendant agreed to and did pay Investor 1 compensation, usually a portion of the purported interest payments, for successfully soliciting these investors. *Id.* at ¶¶ 12-14.

Defendant also personally solicited other investors to participate in the Lending Program based on the same, or almost the same, representations, *i.e.*, investor money (1) would fund loans to liquor license applicants, (2) would be held safely in one or more escrow accounts, and (3) could not be distributed to anybody except the investors or their intermediaries. The relatively high rates of returns, combined with the purported security of the escrowed funds, predictably led these investors to participate in the Lending Program, too. In fact, a number of investors played a role similar to that of Investor 1 - they recruited additional investors into the Lending Program, and received compensation from Defendant for doing so. *Id.* at ¶ 15.

According to the Court-appointed receiver (the "Receiver") in the parallel S.E.C. matter, *SEC v. Champion-Cain*, 19CV1628-LAB (the "SEC Case"), Defendant used the representations described above to directly and indirectly solicit at least 491 investors, who collectively invested at least $372 million in the Lending Program. *See* SEC Case, ECF 516-1, Receiver's Status Report, at p. 9 of 13.[1]

---

[1] The Receiver's status report in the SEC matter makes clear that while the Receiver "has substantially identified the investor population," her data can only be finalized through a completed claims process. *See* SEC Case, ECF 516-1, Receiver's Status Report, at 10.

### D. The Ponzi Scheme

As detailed in the factual basis of her plea agreement, Defendant's representations about the Lending Program were false. Instead of using the investors' money to fund escrow accounts connected to liquor license transfers, she used it to conduct a massive Ponzi scheme. Plea Agreement, ¶¶ 16-17. The list of that which was completely fabricated or fictitious is a long one:

- <u>The Lending Program</u>. Defendant and her coconspirators had not identified liquor license applicants looking for loans, and did not actually place any investor funds in escrow accounts to facilitate the liquor license transfers. *Id.*, ¶ 17.

- <u>The lists of liquor license applicants</u> - Defendant fabricated the lists from which Defendant told investors they could choose particular liquor license applicants to fund. Defendant created the lists based on names she located on the ABC's website; most of the names were associated with cancelled or expired liquor licenses. *Id.*, ¶ 18.

- <u>Escrow Agreements</u> - The form escrow agreements that Defendant distributed to certain investors, which allowed escrow account distributions only to investors, were never operative. Instead, these agreements were forged by Defendant and/or her employees at American National Investments. Unbeknownst to investors, the actual escrow agreements allowed Defendant and her entities to withdraw money from the escrow accounts for any reason and without any meaningful limitations. *Id.*, ¶¶ 19-21.

- <u>Third Party Escrow Instructions</u> – The Escrow Company requested that investors in the Lending Program sign forms acknowledging that distributions could be made from the escrow accounts to Defendant and her companies, or other third parties. This conflicted with Defendant's representations that money could only be distributed to investors. Her solution – Defendant and one or more of her employees

- Due Diligence Documents – Defendant solicited a bank to invest in the Lending Program. To bolster her apparent creditworthiness, Defendant and one of her employees doctored a personal brokerage statement that showed Defendant owned $4.3 million-worth of a particular stock, when she actually owned less than 10% of that amount. *Id.,* ¶ 23.

concealed the forms from investors, forged investor signatures, and returned the forms directly to the Escrow Company. *Id.,* ¶ 30.c.

Through these lies, Defendant convinced individuals and entities to invest in the Lending Program. What she actually did with the money was just as deceitful. In classic Ponzi fashion, Defendant and her conspirators made hundreds of millions of dollars in principal and interest payments to investors. They did so in order to convince investors that the Lending Program was legitimate, which aided Defendant's efforts to recruit new investor victims and perpetuate the scheme. *Id.*, ¶ 25.

Perpetuating the scheme, in turn, allowed Defendant to misappropriate investor funds. She used at least $60 million of this amount to prop up her other, sometimes failing businesses (restaurants, clothing stores, vacation rentals) and millions more to support her luxurious lifestyle – *e.g.*, to make payments on personal residences, and pay for Defendant's salary, San Diego Padres and Chargers box seats, automobiles, jewelry, and vacations. *Id.*, ¶¶ 26-27.

### E. Concealment And Obstruction

Defendant led an effort to conceal her scheme throughout its existence. She dissuaded investors from contacting employees of the Escrow Company about the Lending Program; dissuaded Escrow Company personnel from communicating with Lending Program investors; directed the fabrication and/or forgery of emails, third-party escrow instructions, escrow agreements, lists of liquor license applicants; and made serial misrepresentations to investors and their representatives when questions came up about the Lending Program and its legitimacy. *Id.,* ¶¶ 28-33.

Defendant also obstructed SEC and FBI investigations of the Lending Program. After learning of one or both of these investigations, she:

- Instructed her employees to destroy emails, and refrain from producing electronic calendar, messaging, and trash files that were responsive to an SEC subpoena.
- Directed alterations to American National Investments' accounting records in order to hide the fact that investor funds were used to pay her personal expenses.
- Attempted to solicit an investment of $150 million into the Lending Program, hoping her receipt of these funds would hide the existence, size and scope of the Ponzi scheme.
- Directed the deletion of electronic accounting files reflecting activity in the Lending Program, and the shredding of hard copy documents related to the Lending Program.

Despite Defendant's efforts, investigators were able to recover a significant volume of the evidence Defendant attempted to destroy. *Id.*, ¶¶ 34-43.

### F. Victims And Their Losses

Defendant's fraudulent scheme was enormous in size, and had devastating consequences. As set forth above, Defendant convinced 491 investors to invest a cumulative total of $372 million in the Lending Program.[2] According to the SEC Receiver, approximately 349 of these victims invested more money in the Lending Program than they received, and are thus described as net losing investors. SEC Case, ECF 516, p. 4 of 5. These investors cumulatively lost approximately $183 million. *Id.*

Defendants' victims represent a cross section of the community. Some were wealthy, having amassed assets through successful businesses over many years, for example. Some have decidedly more modest backgrounds, such as a retired state

---

[2] This leaves approximately 142 investors who received more money from the Lending Program than they invested, and are thus net winners.

prosecutor who was counting on the money invested in the Lending Program for his retirement. Victim Impact Statements are still being collected; several received thus far speak to drastic impacts of both a financial and emotional nature. The PSR describes several victim statements that convey victims' loss of their life savings and retirement nest eggs; a sense of betrayal; anxiety and depression after learning of the fraud; and, just as damaging, victims' loss of trust in other people. PSR, ¶ 46-52.

Two victims have expressed an interest in addressing the Court at the sentencing hearing. A third victim is considering the possibility of addressing the Court, but is uncertain as of the date of this filing.

## III.
## SENTENCING GUIDELINES

Pursuant to the plea agreement, the United States recommends the following United States Sentencing Guidelines calculations:

| | |
|---|---|
| Base Offense Level [§ 2B1.1]: | +6 |
| Loss [§ 2B1.1(b)(1)(N)]: | +26 |
| More than 10 Victims [§ 2B1.1(b)(2)(A)]: | +2 |
| Sophisticated Means [§ 2B1.1(b)(10)]: | +2 |
| Gross Receipts from Financial Inst'n > $1,000,000 [§ 2B1.1(b)(17)(A)]: | +2 |
| Organizer, Leader [§ 3B1.1(c)] | +2 |
| Obstruction of Justice [§ 3C1.1] | +2 |
| Acceptance of Responsibility [§ 3E1.1] | -3 |
| **Subtotal Before Departures/Variances** | **39** |
| Adjustment for Statutory Maximums [§ 5G1.1] | -4 |
| Departure [§ 5K1.1] | -3 |
| Departure/Variance* [§ 5K2.0/§ 3553(a)] | -1 |
| **Adjusted Offense Level** | **31** |

Each of these items is discussed below.

**A. Base Offense Level And Guidelines Adjustments**

**Base Offense Level: 6.** As discussed below, Defendant's statutory maximum sentence is three consecutive 5-year sentences, or 15 years. The base offense level

corresponding with statutory maximum sentences of less than 20 years is 6.  *See* USSG § 2B1.1(a)(2).

**Gain Over $150 Million: +26**.  The Guidelines provide that the offense level should be increased by 26 if a fraudulent scheme caused losses of between $150 million and less than $250 million.  *See* USSG §§ 2B1.1(b)(1)(N).  The Government, the SEC, and the SEC Receiver are all gathering evidence to determine the accurate loss amount in this case.  Given the authority conveyed on her by this Court, and the experience and resources she brings to bear, the United States puts great weight on the Receiver's analysis.  The Receiver has determined that the investors as a group invested approximately $372 million in the Lending Program, and received payments (primarily of principal and purported interest) of approximately $207 million, which leaves a difference of roughly $164 million.  SEC Case, ECF 516-1, p. 8 of 13.  This amount includes net winners.  The Guidelines instruct that § 2B1.1(b)(1) loss calculations take into account only net losing investors,[3] whose losses here amount to $183 million.  *Id.*, p. 7 of 18.  The difference, however, does not impact the Guidelines calculation; both of these totals are above $150 million and less than $250 million, making a 26-point increase appropriate under the Guidelines.

**More than 10 Victims: +2.**  Where there are 10 or more victims of a fraudulent scheme, the Guidelines provide for a 2-level upward adjustment.  *See* USSG § 2B1.1(b)(2)(A).  There were approximately 491 investors who entrusted their money to Defendant during the course of this scheme.  Under these facts, and pursuant to the plea agreement, the parties have agreed to recommend (and the United States does so here) a 2-level upward adjustment corresponding with more than 10 victims.

**Sophisticated Means: +2.**  The Guidelines provide for a 2-level upward adjustment where a defendant used sophisticated means to accomplish her fraud.  *See* USSG §

---

[3] Application note 3(F)(iv) specifically addresses Ponzi schemes, stating that "loss shall not be reduced by the money or the value of the property transferred to any individual investor in the scheme in excess of that investor's principal investment (*i.e.*, the gain to an individual investor in the scheme shall not be used to offset the loss to another individual investor in the scheme)."

2B1.1(b)(10). Here, Defendant created an exotic (albeit fictitious) investment opportunity, pitched it to often sophisticated investors by piling layers of deception upon some kernels of truth about liquor license transfers under California law, and kept her scheme hidden through fake email addresses, doctored escrow agreements, and forgeries. This enhancement is therefore appropriate under the Guidelines and, through the plea agreement, the parties have agreed to recommend it here.

**Gross Receipts from Financial Inst'n > $1,000,000: +2.** Guidelines § 2B1.1(b)(17) provides for a 2-point enhancement where "the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense." Here, a financial institution invested $25 million in the Lending Program, and has yet recovered any of this amount.

**Organizer, Leader: +2.** Defendant was the central actor in this scheme. She personally went to extraordinary lengths to organize its moving parts, and variously directed, cajoled, flattered, and persuaded other people that could in some way help her accomplish her goal. Only a small subset of these individuals knew Defendant was engaged in fraud. Because the Government does not yet have sufficient evidence to determine that Defendant directed five or more knowing participants in her scheme, it recommends a 2-point enhancement under USSG § 3B1.1(c).

**Obstruction of Justice: +2.** As set forth above and in Defendant's guilty plea, Defendant obstructed, and attempted to obstruct, the SEC and FBI investigations surrounding the fraudulent Lending Program, making a 2-level enhancement appropriate. *See* USSG § 3C1.1.

**Acceptance of Responsibility: -3.** The United States moves the Court for a downward adjustment for Defendant's acceptance of responsibility pursuant to USSG § 3E1.1. Defendant admitted her crimes and pleaded guilty prior to indictment. In addition, according to the PSR, Defendant "expressed shame in herself for her poor choices and regret for her actions" during her probation interview. PSR at 15, ¶ 59.

**Adjustment for Statutory Maximum Sentences: -4.** Based on the foregoing, Defendant's adjusted offense level before other departures and variances is, by the United States' calculation, equal to 39. Defendant has no criminal history. The corresponding Guidelines range, before taking into account statutory maximum penalties, is 262-327 months.

An additional downward departure is appropriate to reflect the statutory maximum sentences for the crimes to which Defendant has pleaded guilty. Defendant pleaded guilty to three charges, each with a five-year statutory maximum sentence. *See* 15 U.S.C. § 77x (providing for imprisonment of "not more than five years"); 18 U.S.C. § 1505 (same); 18 U.S.C. § 371 (same). Section 5G1.2(c) of the Guidelines instructs that sentences on multiple counts should generally run concurrently, unless certain circumstances are present.

> [I]f the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment.

USSG § 5G1.2(d).

Here, consecutive maximum sentences on all three of the crimes to which Defendant pleaded guilty (cumulatively totaling 15 years, or 180 months) are less than the Guidelines range before departures (262 – 327 months). Under these circumstances, the Court should set aside the Guidelines range before departures, and deduct departures under Part 5 from the concurrent statutory maximum sentence of 180 months. *See* USSG §§ 1B1.1(a)(7)-(8), 1B1.1(b) (instructing Court to determine sentence in light of, *inter alia*, USSG § 5G , and "*then*" consider Parts H and K of Chapter 5") (emphasis added).

> [A] court imposes a sentence 'in accordance with the guidelines' when it follows the Guidelines – including the parts of the Guidelines that instruct it to disregard the advisory ranges, *see* USSG §§ 1B1.1(a)(8), 5G1.1(b) – in settling on a sentence. And that is precisely what the court did here. It properly discarded the advisory ranges, *ibid.*, and permissibly considered only factors related to petitioners' substantial assistance, rather than factors related to the advisory ranges, as a guide in determining how far to depart downward, USSG § 5K1.1.

*Koons v. United States*, 138 S. Ct. 1783, 1789 (2018).  Turning to the Sentencing Table at USSG § 5A, the highest adjusted offense level that encompasses Defendant's statutory maximum 180-month sentence is 35.  Because Defendant's offense level was 39 before considering statutory maximum sentences, a -4 adjustment is appropriate under the Guidelines.  Pursuant to the authority set forth above, departures and variances (as described in terms of equivalent offense levels) should be deducted from 35.

**Departure/Variance under USSG § 5K2.0, 18 U.S.C. § 3553(a): -1.**  The United States recommends a downward departure/variance.  *See* USSG § 5K2.0, 18 U.S.C. § 3553(a).  As described above, Defendant has admitted to her crimes.  She has gone beyond that which typically constitutes acceptance, primarily by furthering victim restitution efforts and agreeing to the SEC's emergency motion for appointment of a receiver, an asset freeze, and other preliminary relief.  Defendant also accepted responsibility when first approached by criminal authorities regarding the facts stated above, and has saved resources the Government would have otherwise spent prosecuting the case.  In addition, she pleaded guilty during the current pandemic.  Based on these facts, the United States moves for a 1-point departure or variance.

**B. Criminal History**

The United States knows of no criminal history associated with Defendant.  Defendant therefore falls into Criminal History Category I.

**C. Section 3553(a) Sentencing Analysis**

The Sentencing Guidelines are an important factor that must be calculated and considered by the Court in fashioning an appropriate sentence, but they are only one of the factors set out in 18 U.S.C. §3553(a) that ultimately guide a district court in the exercise of its discretion.  *See United States v. Sylvester Norman Knows His Gun, III*, 438 F.3d 913, 918 (9th Cir. 2006).  In the present case, however, the Guidelines provide the correct sentencing range.  The Government's recommendation is 130 months, which is toward the upper end of this range.

1. **Nature And Circumstances Of The Offense.**

This was a typical Ponzi scheme in several respects – Defendant raised money with promises that she would invest it, but instead used the money to pay back earlier investors and, of course, line her own pockets. Defendant, however, put Ponzi on steroids, drawing in at least $372 million from over 490 investors. The scheme had staying power, lasting for at least seven years, mostly due to Defendant's high level of personal involvement and her ability and willingness to manipulate others. Her victims came from many walks of life, from wealthy investors who lost tens of millions of dollars, to a former state prosecutor who had a far more modest nest egg that he could not afford to lose.

Although analysis is still underway, an FBI forensic analyst estimates that Defendant extracted over $150 million from the scheme. She used it to keep her various businesses afloat, and to support her own luxurious lifestyle.

2. **History And Characteristics Of Defendant**

Defendant has a number of favorable characteristics. She is married and has apparently positive relationships with her parents and siblings; does not suffer from substance abuse problems; enjoys a successful history in the business community; gave her time and money to community and philanthropic causes; and has no criminal history and, before this case, few (if any) blemishes on her record. These were all considerations in the United States' agreement to recommend a one-point departure for a combination of circumstances. The United States feels strongly that Defendant's history and characteristics should not form the basis for additional departures or variances.

3. **The Need For Sentence To Reflect Seriousness Of The Offense**

Leading a conspiracy to commit securities fraud through serial misrepresentations, followed by a concerted effort to obstruct Government investigations in order to keep the scheme going is unquestionably a serious offense. Defendant persuaded investors to entrust her with their money through promises that their funds would be entirely safe in a bullet-proof escrow account, when, in fact, she could withdraw the money herself with no

meaningful limitations.  Her conduct harmed hundreds of investors.  Defendant's sentence should reflect the seriousness of her crime and the harm she has caused.  A 130-month sentence would promote respect for the law in general, and for the securities laws and regulations governing those who solicit investors, in particular.

### 4.      Deterrence / Avoiding Unwarranted Sentencing Disparities

The sentences imposed in this case should deter others from running similar fraudulent investment schemes.  An inadequate sanction, as Defendant might request, would be insufficient to adequately punish and deter, and would create unwarranted sentencing disparities that the Ninth Circuit and Sentencing Commission have sought to avoid.  Other individuals and businesses who solicit funds from investors must understand that the repercussions of fraud in this context will be significant and include substantial custodial time.  An insignificant sentence would reinforce the notion that fraud is different than "real crime," and will earn the perpetrator merely the proverbial "slap on the wrist."

Sentences in other massive Ponzi schemes are instructive here to varying degrees. Bernard Madoff was sentenced to 150 years for his $17.4 billion scheme, and Allen Stanford to 110 years for a $7 billion scheme – but those crimes were on a very different order of magnitude.  More comparable federal sentences include those of:  (1) Claud "Rick" Koerber, who received 170 months for a $100 million Ponzi scheme in the District of Utah (Case No. 17CR37, ECF 638); (2) Michael Stewart, who received 168 months for a $169 million Ponzi scheme in the Central District of California (Case No. 14CR14, ECF 212); and (3) Duane Hamblin Slade, who received 180 months for a $166 million scheme in the District of Arizona (Case No. 13CR460, ECF 55).  While all cases and defendants present unique circumstances, and Defendant's cooperation sets her case somewhat apart from those just cited, these sentences show that a sentence of 130 months would not create unwarranted sentencing disparities as to other individual defendants who ran very large Ponzi schemes.

Several facts make clear that specific deterrence is also important in this case. When particular investors performed diligence and identified red flags, Defendant attempted to allay their suspicions though fabricating documents, forging signatures, and telling investors lies through fake email accounts. And, as Defendant admits, even after learning of investigations into her conduct, she destroyed and altered evidence in an effort to cover up her misconduct and perpetuate her scheme. The recommended 130-month sentence therefore would specifically deter Defendant from further fraudulent or obstructive conduct.

### D. The Kinds Of Sentences Available

#### 1. Probation

If the recommendation of the United States is accepted, Defendant's adjusted offense level of 31 falls within Zone D of the Guidelines Sentencing Table; taking into account her Criminal History Category I, the Guidelines range is 108-135 months. Given the serious nature of the offense, the Guidelines do not contemplate a probationary sentence. USSG § 5B1.1, comment (n.2). As stated above, the Government recommends a 130-month custodial sentence.

#### 2. Fine

Because the adjusted offense level is 31, the fine range is $30,000 to $300,000. USSG § 5E1.2(c)(3). Taking into account an asset freeze in the SEC case, and the restitution order the United States expects to seek (discussed directly below), the United States recommends that any funds that become available to Defendant should be used to satisfy a restitution order in lieu of a fine.

#### 3. Restitution

The Defendant should be ordered to pay restitution. In deciding upon an appropriate restitution order, the Court should consider "the amount of loss sustained by each victim as a result of the offense." 18 U.S.C. § 3663(a)(1)(B)(i)(I). However, all relevant victim-specific loss amounts have not yet been determined.

The United States has remained in consistent contact with the SEC Receiver. The Receiver recently filed a status report regarding its forensic accounting efforts. The status report states that the "forensic accounting, which currently reflects over $1 billion of transactional detail, is now close to being complete," and "the overall picture of the total investor population and their losses from the Ponzi scheme is now much clearer." SEC Case, ECF 516, p. 4. However, the receiver's forensic accounting is not yet complete – additional records are being collected, *see id.*, ECF 556 at 17, and a claims process will be required in order to (among other things) make sense of significant money flows to and from aggregators (*i.e.*, investors who solicited other individuals and entities to invest in the Lending Program). *See id.*, ECF 561-1 at 10 ("It is also critical to note that because of how certain investors and aggregators treated and/or handled investor funds, a forensic accounting without a completed claims process will not produce a final total net loss amount."). The United States seeks to leverage the Receiver's work for purposes of restitution, primarily because the Receiver brings significant resources to bear – a dedicated team of accountants, lawyers, and others – and has made what appears to be impressive progress in her forensic accounting efforts. Further, the Court has ordered the Receiver to complete its forensic accounting by the end of March 2021. SEC Case, ECF 552, p.1 of 2.

Under the governing statute, a restitution hearing may take place up to 90 days after sentencing. 18 U.S.C. § 3664(d)(5). An order of restitution may be issued after this 90-day timeframe under appropriate circumstances. *See Dolan v. United States*, 560 U.S. 605, 610 (2010) ("The fact that a sentencing court misses the statute's 90-day deadline, even through its own fault or that of the Government, does not deprive the court of the power to order restitution."). This is true "at least where … the sentencing court made clear prior to the deadline's expiration that it would order restitution, leaving open (for more than 90 days) only the amount." *Id.* at 608.

Given this authority, and the fact that a full restitution analysis has not yet been possible but likely will be completed by the end of March 2021, the United States

recommends that the Court state on the record that it will order Defendant to pay restitution, and set a status hearing regarding restitution for approximately 70 days after the March 31, 2021 sentencing date.

## IV.
## CONCLUSION

The United States recommends that the Court sentence Defendant to 130 months in prison. Once she has completed her custodial sentence, Defendant should be placed on a period of supervised release for three years.

DATED: March 24, 2021                             Respectfully submitted,

                                                             DAVID D. LESHNER
                                                             First Assistant United States Attorney

                                                             */s/Aaron P. Arnzen*
                                                             AARON P. ARNZEN
                                                             ANDREW J. GALVIN
                                                            Assistant United States Attorneys