```
 1                    UNITED STATES DISTRICT COURT

 2              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   UNITED STATES OF AMERICA,           )
                                         )
 5        Plaintiff,                     ) No. 20-CR-2115
                                         )
 6             v.                        ) March 31, 2021
                                         )
 7   GINA CHAMPION-CAIN,                 ) 9:01 a.m.
                                         )
 8        Defendant.                     ) San Diego, California
     _____)
 9

10                      TRANSCRIPT OF SENTENCING
                  BEFORE THE HONORABLE LARRY ALAN BURNS
11                    UNITED STATES DISTRICT JUDGE

12   APPEARANCES:

13   For the Plaintiff:        UNITED STATES ATTORNEYS OFFICE
                               By:  AARON ARNZEN, ESQ.
14                                  ANDREW GALVIN, ESQ.
                               880 Front Street
15                             San Diego, California  92101

16   For the Defendant:        SCHEPER KIM & HARRIS
                               By:  DAVID CHARLES SCHEPER, ESQ.
17                                  ANGELA MARIE MACHALA, ESQ.
                               800 West Sixth Street
18                             Los Angeles, California  90017-2701

19

20   Court Reporter:           CYNTHIA R. OTT, RDR, CRR
                               District Court Clerk's Office
21                             333 West Broadway, Suite 420
                               San Diego, California, 92101
22                             cynthia_ott@casd.uscourts.gov

23

24

25   Recorded by Stenography, Transcribed by Computer
```

2

```
 1              SAN DIEGO, CALIFORNIA, MARCH 31, 2021, 9:01 A.M.

 2                              * * * *

 3              THE CLERK:  Calling number 1 on the calendar,

 4    20-CR-2115, United States of America versus Gina Champion-Cain.

 5    If counsel can state their appearances for the record, please.

 6              MR. ARNZEN:  Aaron Arnzen and Andrew Galvin for the

 7    United States, Your Honor.

 8              THE COURT:  Good morning.

 9              MR. GALVIN:  Good morning, Your Honor.

10              MR. SCHEPER:  Good morning, Your Honor.  It's hard not

11    to stand up in this court.  This is David Scheper with Angela

12    Machala for the defendant, Ms. Cain, who's present.

13              THE COURT:  All right.  Good morning.  And good to see

14    you, Mr. Scheper, after a long time.

15              This matter is on for sentencing today.  And I have

16    gone over what I think are all of the filings.  And I want to

17    double check with counsel that I've reviewed everything that's

18    been filed.

19              To begin with, a presentence report was prepared by

20    the probation department.  I have read and reviewed that.

21    Mr. Scheper, have you gone over that with your client?

22              MR. SCHEPER:  Yes, Your Honor.

23              THE COURT:  Both sides here filed sentencing summary

24    charts.  I have reviewed those.  The government's filed a

25    motion for departure under 5K1.  I have reviewed that.  The
```

1    government's filed a sentencing memorandum, and I have read and

2    considered that.  Also, on behalf of the defendant, a

3    sentencing memorandum was filed, and I have read that.

4            I've looked at all of the attached exhibits to the

5    sentencing memo.  Ms. Machala filed a declaration that relates

6    to the sentencing memo, and I have considered that.

7            There were a number of letters filed on behalf of the

8    defendant.  I have gone through and read each and every one of

9    the letters.

10           Reference was made by the defense to United States

11   versus Norton, a case decided in 2007.  I was provided with a

12   copy of the transcript in that case and the plea agreement.  I

13   have reviewed that.

14           I got a written copy of the statement that

15   Ms. Champion-Cain made to the probation officer and I have

16   reviewed that.

17           There were various exhibits filed, including some

18   having to do with the defendant's businesses.  I have looked at

19   those.

20           I've looked at the plea agreement that was reached in

21   the case.  There was, I think, some minor objections.  And by

22   minor, I mean they were mostly corrections.  I've reviewed

23   those.  There was an addendum that addressed the objections.

24   And I think that's it.

25           I've also looked back at the transcript of the Crispin

```
 1    Torres sentencing, which was just a couple of weeks ago, a
 2    related defendant in the case.
 3            Does that sound like a comprehensive list of
 4    everything that was filed?  Do you know of anything,
 5    Mr. Scheper, that I've neglected to mention that was filed?
 6            MR. SCHEPER:  I don't know of anything, Your Honor.
 7    Very comprehensive.
 8            THE COURT:  Okay.  Government counsel, can you think
 9    of anything that I've missed in my accounting of what I've
10    looked at?
11            MR. ARNZEN:  No, Your Honor.
12            THE COURT:  Let me -- I have some preliminary remarks
13    about this, but let me deal with the objections first.
14            The defense has objected to victim impact statements
15    made by several of the victims in this case.  And I've looked
16    at that.  These are subjective statements made by victims.
17    They appear to me to be, you know, appropriate victim impact
18    statements.
19            I will consider those for what they are, which is a
20    subjective statement of feelings about the impact of the case.
21    I'm not -- the defense points out, for example, that in some
22    cases, the writers impute to the defendant an intent to harm
23    them.  And Ms. Champion-Cain, through her counsel, denies that,
24    of course.  I understand that.  It's a subjective impression on
25    their part.
```

1          So as to paragraph 48, 49, and 52, Mr. Scheper, if

2     it's agreeable to you, that's how I'll treat those, rather than

3     direct any correction to the probation report.

4          MR. SCHEPER:  Yes, Your Honor.  And I'll just say, we

5     don't contest the pain is real.  And the intention -- absolute

6     core intention may not be material, the pain is real.  And I

7     take Your Honor's point.

8          THE COURT:  Okay.  There's some other minor

9     corrections.  Page 3, Ms. Champion-Cain, I'm told, is not 5'4",

10    she's 5'5", so the probation officer can change that.

11         And page -- paragraph 31, I think it's just a mistake,

12    the word "phone" should be changed to "phoney" in the first

13    sentence.  It's a typographical error.  So if we could make

14    that change.

15         And then it's pointed out in paragraph 88 that

16    Ms. Champion-Cain grew up in the Midwest, and had Midwestern

17    not Western values, so we can make that change as well.

18         I want to mention, preliminarily, I've been informed

19    by the government that there are certain victims of the offense

20    who are here today.  Under the Crimes -- Crime Victims' Rights

21    Act, this is Section 3771 of Title 18, and Rule 32, the crime

22    victims have a right to speak at sentencing.  And I'm going to

23    afford anyone who desires to speak, to speak.

24         I'd ask you to direct the comments to the Court, not

25    to the defense table, not to Ms. Champion-Cain.  And I'd ask

1  you to keep your comments, if you can, under -- under two

2  minutes.  I want to hear from you.  You have a right to speak.

3  It's important that you exercise that right, if you choose to.

4       But I want to make sure that this remains dignified,

5  and that the comments come to the Court, who after all,

6  considers the crime victims' point of view, not to the

7  defendant directly.  So just that as a preliminary matter.

8       So I think that's it.  I have some questions.  I think

9  they'll come up in the -- in the course of the discussion

10  today, but I think I'll reserve those until after I've given

11  you a chance to be heard.  So I'm happy to hear from you on

12  behalf of the defendant.

13       MR. SCHEPER:  Very well, Your Honor.

14       You mentioned it's been a long time.  We go back to, I

15  think 1992, when I saw you speak in Chicago, when you were my

16  counterpart in San Diego to what I was doing in Los Angeles.

17  And the road has been long since 1992, and it's taken you to

18  great places, and it's taken me to new and different places.

19       But one thing has been central in the going on 29

20  years that you and I have been acquainted, and that is that

21  important messaging in criminal justice in federal court is

22  that crime does not pay.

23       And I know that Your Honor is going to put a sentence

24  out today that will prove to Ms. Champion-Cain, and to other

25  would-be wrongdoers that crime doesn't pay.

1          But another message that I learned, and I think you

2     learned, is that where you have been caught, where you have

3     nowhere to go, you come to a pivot point.  Am I going to

4     stonewall and fight, or am I going to help?  Am I going to try

5     to mitigate loss?  Am I going to try to mitigate the pain that

6     I caused to so many people, some of whom you're going to hear

7     from directly today.

8          And Ms. Champion-Cain, from the time Aaron Arnzen and

9     Drew Galvin phoned me in September of 2019, has chosen that

10    course.  I want to ease, to the greatest extent I can, the pain

11    I've caused with deliberate actions.  And you're going to hear

12    from Ms. Champion-Cain.  You're going to hear from her

13    directly, if Your Honor permits, explain herself, and make her

14    own request for some level of mercy from the 15-year statutory

15    max.

16         But that is my pitch to Your Honor, that whatever you

17    do under 15 years is a signal not just to Gina Champion-Cain,

18    an admitted wrongdoer, but it's a signal and a message to our

19    community at large, and even to the victims who have felt the

20    pain that we don't deny, that I've told you is real, that

21    cooperation does pay.

22         Crime doesn't.  Cooperation does.  And that's where

23    Your Honor -- the government's 5K1 and our request for a

24    departure downward from the 15-year statutory max comes from.

25         She has helped to a -- really, an extraordinary

1    degree.  And the prosecution, where you once sat and stood,

2    they'll tell you the same thing.  This woman did her level best

3    to give back through her time, her brain, and her heart to

4    lessen the impact that her admitted crimes caused.

5            And so that's, Your Honor, where our motion for relief

6    from the statutory maximum comes from.  Tell her she chose

7    wisely to decide to help at the get-go, when she interacted

8    with the receiver, the SEC, and federal criminal justice, that

9    it eased her pain, and that by her trying to ease, to the

10   greatest extent she could, the pain of her many victims, she

11   has an opportunity for a life after federal prison.

12           I tell you, Your Honor, I think you're not betting on

13   a long shot by providing some relief.  This is, as you know

14   from the people who still provide testimonials to her, that

15   she's far from all bad.  It got away from her in her business

16   life to a great degree, and she will never forgive herself for

17   that.  But she also won't forgive herself if she goes to prison

18   for what we know is going to be a goodly number of years, and

19   not try to ease the pain of people who didn't have her

20   privilege, who didn't have her parents, who didn't have her

21   education.

22           She's going to try to make life better for fellow

23   inmates.  And, yes, she craves a life after prison, but that

24   life after prison is going to look nothing like the last eight

25   years.

1          She will put her community and helping people at front

2     of mind, not just most of the time, but all the time.  That is

3     going to be her ultimate legacy, is what she does in and after

4     prison.

5          And, Your Honor, with the greatest of respect, a

6     15-year sentence does a disservice to the help she's provided

7     for a year and a half.  And this is me subjectively speaking,

8     it does a disservice to what she has to offer both in and after

9     prison.

10          She is a life force, as those who hate her now, those

11    who love her still, would attest.  So that's what I have to say

12    about where I think Your Honor ought to decide.

13          The government and I, we agree there should be a

14    departure.  We disagree on the extent of the departure.  I

15    leave it to your powers to decide where on the spectrum that

16    should fall, but I just close that piece of my remarks, that it

17    should fall below 15 years.

18          The second point I want to say, unless the mic is

19    going to get cut off on me, is I wanted to address the question

20    of remand today versus remand after vaccination.  And I simply

21    say, Your Honor, again, for a year and a half plus, since the

22    time Aaron Arnzen phoned me, and I made the connection that his

23    uncle was a Notre Dame basketball player 50 years ago, she has

24    been spotless, in terms of her appearing at court, appearing

25    for meetings, doing everything she needs to do.

1          There's not a blemish on her card with the probation

2    office.  Please let her get her shot or shots, and I'm talking

3    literally a matter of just a few weeks.  That's my second

4    point.

5          And then the third point, I know you don't have the

6    power to command, you have the power merely to request a place

7    of confinement.  And she very much would like Your Honor to

8    place the Dublin prison facility.  It is accessible in one

9    flight for her aged parents flying in from hated Ann Arbor.

10   And if we -- if that would be allowable, that Your Honor would

11   advise that Dublin be the location for her term, which we know

12   is a certainty.

13         And with that, Your Honor, I know Ms. Champion-Cain

14   has some things to say, but that's my pitch to you.

15         THE COURT:  Before I hear from her, I neglected to

16   mention and ask you, I'm sure she has supporters here.  Have

17   all of her supporters been able to come in and be here in

18   court?  Those that --

19         MR. SCHEPER:  Oh, I mean, her parents couldn't travel

20   because of COVID.

21         THE COURT:  All right.  I sent out an e-mail a couple

22   days ago saying that priority seating would be given to

23   Ms. Champion-Cain's supporters and family members.

24         MR. SCHEPER:  She does have supporters.

25         THE COURT:  And also to the victims.  So I wanted to

1    make sure that that accommodation has been made.  You're

2    satisfied that nobody's been shut out that wanted to come in,

3    in support of her?

4             MR. SCHEPER:  Nobody has been unfairly shut out.

5             THE COURT:  Okay.  Ms. Champion-Cain, I'm happy to

6    hear from you, whatever you want to say.

7             THE DEFENDANT:  Thank you, Your Honor.

8             I've written down my thoughts.  I wanted to make sure

9    I could articulate them to you and to my victims.  So forgive

10   me for reading.

11            I want you to know that I absolutely understand the

12   gravity of my crimes, and the horrible impact that they have

13   had on my victims and their families, as well as my family, my

14   friends, and community.  I behaved in ways that were horrific.

15   And I made terrible choices that did not align in any way with

16   my own value system that I grew up with.

17            My actions have hurt so many people.  I feel terrible

18   for my victims.  These are people who trusted me, or they

19   trusted people that were involved with me.  I've wanted to

20   reach out to all of them, but upon the advice of my attorneys

21   not to undermine the government's case against me and others, I

22   did not do so.  Yet my number one goal will be to help recover

23   as much money as possible for all of them.  And I stand ready

24   to continue to assist the government in its efforts to recover

25   ill-gotten gains from willing participants and benefactors.

1           The question I hear, and I ask myself is, why would a

2    woman who was brought up in such a loving environment with the

3    gift of education, who has worked hard all her life, and who

4    has loved her family and friends fiercely, why would someone

5    like me engage in such horrendous conduct.

6           I've been evaluating my life, trust me.  And all I've

7    ever really believed in has been helping people and pleasing

8    people.  Yet along the way and coming out of the recession of

9    2008, I reached a desperation point.  I worked hard to generate

10   wealth for my family, my friends, and myself.

11          As we all struggled to make it out of that dark

12   economic hole, I kept trying to pull deals together, to be

13   creative in recreation of my businesses, but I kept failing.

14   And I panicked.  And I felt I needed to support an image, an

15   image of who people believed that Gina Champion-Cain was.

16          But I deserve to be punished.  And I promise that I

17   will use the future to take what I have done, and the impact it

18   has made to try and help others.  This time, in the wholesome

19   and charitable ways that I was taught by my grandparents and my

20   parents, and that I had always demonstrated prior to this

21   segment of my life.

22          I truly believe that there is light out of darkness.

23   I believe in the sun, even when it is not shining.  And I have

24   felt the darkness of dramatic changes with incomplete goodbyes

25   and uncertain futures.  But the light of God's love surrounds

1    me and others, and it offers everyone hope.  And I am committed

2    to be the light to help others less fortunate than I have been.

3          I will hopefully use my time while incarcerated to

4    help teach others in whatever ways I can.  Whether it be math,

5    grammar, reading skills, or other more advanced concepts

6    related to real estate and business.

7          I will also try and teach others the fundamentals of

8    successful entrepreneurship, with the emphasis on using a moral

9    compass to navigate through business's sometimes treacherous

10   waters.

11         The wounds will eventually heal, although they will

12   leave scars forever, but those scars won't impede what I will

13   do for the rest of my life.  And that is to help people

14   overcome hardships, understanding professional right from

15   wrong, and giving comfort in times of need.

16         I can figure out how to help people the right way,

17   because if nothing else, I have shown that I can be effective

18   in whatever I put my mind to do.  I know I can use my skill set

19   for the betterment of others, and I will seek forgiveness and

20   do the right thing by giving back, and never slipping down this

21   dark hole again.

22         And I thank you for the time you've given me, Your

23   Honor.

24         THE COURT:  All right.  Anything else initially,

25   Mr. Scheper?

1          MR. SCHEPER:  I did leave one thing out, and that is,

2    literally, in the last day or two, we learned that another

3    settlement had been reached in the receivership, and another

4    $750,000 has been recovered from somebody as a result of

5    Ms. Champion-Cain's cooperation.  And, again, these are drops

6    compared to the pain, but they're things that she has tried to

7    do with every waking day and waking night since Aaron Arnzen

8    phoned me in 2019.

9          THE COURT:  All right.  Thank you.

10          On behalf of the United States, who speaks for the

11    government today?

12          MR. ARNZEN:  I do, Your Honor.  Aaron Arnzen.

13          The defense has submitted a sentencing memo and a

14    summary chart that suggests the sentence of around five or six

15    years as appropriate, Your Honor.  The United States urges the

16    Court to approximately double that sentence to just under 11

17    years.

18          This is due to the nature and circumstances of the

19    crime.  Mostly, because of the size of this scheme.  It was so

20    significant for a few reasons, Your Honor.  First, the amounts

21    of money involved.  372 million dollars were taken in through

22    the scheme, causing losses to net losers, as they're termed,

23    between 183 and 188 million.

24          It was also large, in terms of the number of victims

25    here.  The number of victims are over 400, according to the

1   receiver in the related SEC case.  It's also significant

2   because of its longevity.  It lasted from 2012 to 2019, seven

3   years or so.

4          And, finally, it was -- it's such a significant

5   sentence because of such a serious crime.  And it was so

6   serious because of the manner in which it was executed.  The

7   way in which Ms. Champion-Cain executed this scheme involved

8   several lies and layers of lies.

9          She lied about the lists of liquor license applicants

10  who needed loans.  She lied about the use of funds.  She lied

11  about how the money would be maintained.  She said it would be

12  in a bulletproof escrow account.  She lied about who had access

13  to those funds from the escrow account.

14         The victims thought that only they or their

15  intermediaries would have access to the funds.  In fact,

16  Ms. Champion-Cain did.

17         And she created forged and phoney documents year after

18  year, time after time, especially when there were efforts to

19  perform due diligence by investors in the scheme, by investors

20  in the lending program.

21         Especially when the heat turned up or the spotlight

22  was on, Ms. Champion-Cain turned on the forgery machine.  She

23  created fake e-mails.  She has any number of layered manners of

24  deception targeted mostly toward the investors, Your Honor.

25         Finally, as set out in our papers, and as detailed in

1    the plea agreement, Ms. Champion-Cain obstructed the federal

2    investigations that were going on.

3            The SEC, Securities and Exchange Commission, issued

4    subpoenas to Ms. Champion-Cain and to others as it relates to

5    this scheme.  Ms. Champion-Cain's reaction to that

6    investigation was to change, hide, and destroy evidence.  It's

7    extremely serious, especially when you're talking to this side

8    of the courtroom.

9            And perhaps most important, it's so serious because of

10   the impact on the victims.  Our victim coordinator, Dina

11   DeBoer, is here.  She has talked to one victim after another

12   after another.  And it is virtually universal that this

13   particular scheme caused particular pain and a heightened

14   degree of pain, not only because of the monetary losses, but

15   because of the connections that they felt with

16   Ms. Champion-Cain.

17           Your Honor, for those reasons, the United States

18   thinks that a 130-month sentence is appropriate.  This is less

19   than the statutory maximum, because -- but that is almost

20   entirely due to the 5K motion that we filed with Your Honor and

21   shared with defense.

22           THE COURT:  May I ask you about that, Mr. Arnzen?

23           MR. ARNZEN:  Yes, sir.

24           THE COURT:  My understanding is that two people have

25   been charged criminally.

1          MR. ARNZEN:  That's correct, Your Honor.

2          THE COURT:  If you can tell me, is it anticipated that

3     other -- other defendants will be charged?

4          MR. ARNZEN:  Yes, Your Honor.

5          THE COURT:  There's a -- I referred earlier to

6     Mr. Torres sentencing, which preceded Ms. Champion-Cain's.  And

7     of course, the government recommended a downward departure in

8     his case for cooperating, too.  But the gist of the cooperation

9     in both cases is against one another.  You know, Torres told

10    you what he knew about Ms. Champion-Cain and the operation.

11    And for the bulk of it, what she told you implicating anyone

12    else in a crime is about Mr. Torres.

13         And the incongruity, it seems to me, is that she put

14    him up to all of this.  That's what I was told at his

15    sentencing, is that she was the kingpin.  She put Mr. Torres up

16    to this.  And so I'm having a little bit of difficulty

17    understanding, you know, substantial assistance in this

18    context.

19         I -- I have, you know, great respect for you and

20    Mr. Galvin.  And pursuant to the guidelines, I'm to give

21    significant weight to your recommendation.  But I'm having some

22    trouble seeing this.  I mean, two people are arrested about

23    simultaneously, or charged simultaneously, and they both tell a

24    little bit on one another.  And we give both of them credit for

25    telling on each other?  That doesn't seem to fit the bill to

1    me.

2           MR. ARNZEN:   Understood, Your Honor.

3           I perhaps mention it too often, especially to my

4    colleagues, but I worked on the Bernie Madoff investigation

5    when I was an SEC staff attorney in New York for five years.

6    Mr. Madoff famously told investigators, and anybody else who

7    would listen, that he was the only person involved.  He

8    stonewalled investigators, he pled open, and we got no

9    assistance.

10          Instead there was a campaign of disinformation from

11   Bernie Madoff.  And that set back two significant efforts.  It

12   set back the investigation, efforts to hold others who were

13   culpable accountable, and perhaps charge them.  Even more

14   importantly, though, it led to an enormous effort that was

15   necessary by the trustee in that case.

16          The trustee is similar to the receiver in the SEC case

17   here.  The trustee is still at it.  Even though the crime was

18   charged in 2008, here we are 13 years later, and the trustee is

19   still racking up fees, is still after money that could have

20   been gotten, had Mr. Madoff told the truth and actually helped

21   in the investigation.

22          Most of our 5K is based on Ms. Champion-Cain's

23   efforts, both directly and through her counsel, to help the

24   receiver here get money back, because it's a financial crime,

25   money is a lot of the point.

1          They've done a very good job of that.  The receiver

2     has had to expend way less in terms of energy, time, and money.

3     The trustee in the Madoff case racked up 150 million dollars in

4     fees.  Let's hope that doesn't happen here, or nothing close to

5     it.  Granted it was a different order of magnitude, but

6     Ms. Champion-Cain and her counsel have done that for us.  And

7     they've also, frankly, helped us target our investigative

8     efforts.

9          She can tell us who was -- who we're paying attention

10    to that has some information to pursue, and who doesn't.  And

11    given the number of people that surrounded this scheme, that

12    touched it, in one way or another, that's been extraordinarily

13    valuable from an investigative standpoint.

14         Your Honor denied the government's motion to continue

15    the sentencing hearing.  We're not arguing with that.  We

16    expect to come back with a Rule 35, because we expect,

17    ultimately, that we'll be able to tell Your Honor with real

18    results, judicial results, that this -- this assistance was

19    valuable.  It has already been valuable.

20         And we -- we concur, in part, with Mr. Scheper.  There

21    should absolutely be a message that when you reach the pivot

22    point, the right -- the right decision is to cooperate with the

23    United States, to own up to your conduct, and to help us

24    investigate the crime, so we can determine who, if anybody

25    else, should be held accountable.

1          THE COURT:  The other question I have is this.  You

2     have mentioned that this scheme was perpetrated over at least a

3     seven-year period, beginning in 2012, running through, what,

4     2019?

5          MR. SCHEPER:  Yes, Your Honor.

6          THE COURT:  And you, of course -- not you personally,

7     but the government decides what charges to bring, and how many

8     charges to bring.  I'm assuming that there were many more and

9     serious charges that could have been brought, based on the

10    investigation of this, is that right?

11         MR. ARNZEN:  That is absolutely correct, Your Honor.

12         THE COURT:  So this -- what's in front of me today

13    with three charges is the product of a charge bargain, where

14    you decided, we'll pick three charges that carry no more than

15    five years each, and we'll dispense with other charges that may

16    have carried a higher max, right?

17         MR. ARNZEN:  Yes, Your Honor.

18         THE COURT:  Because the guidelines, even as you

19    calculate them, are much, much higher than the statutory

20    maximum here, right?

21         MR. ARNZEN:  That's correct.

22         THE COURT:  You have 262 to 327 months?

23         MR. ARNZEN:  Yes, Your Honor.

24         THE COURT:  So exposure of, you know, closer to, what,

25    30 years, I suppose, than 15, right?

1          MR. ARNZEN:  You're right.

2          THE COURT:  My question to you is this.  You made a

3   decision, which is none of my business, this is your

4   prerogative under the system, to select charges and to limit

5   the exposure of the defendant.  To what extent did the

6   cooperation of the defendant figure into that decision already,

7   the fact that you lowered her exposure to 15 years from almost

8   30 years?  Did you take into consideration the cooperation as

9   part of that charge bargain?

10          MR. ARNZEN:  The opportunity to gain cooperation, yes,

11   Your Honor.

12          THE COURT:  Okay.  So it's been accounted for, it

13   seems to me, in a very significant way.

14          MR. ARNZEN:  There was a back and forth, as every

15   fraud case that I've ever been involved with has, between

16   defense counsel and us about what the appropriate charges were.

17   Part of our analysis, you're right, was the ability to gain

18   cooperation, so that this situation did not turn into the

19   Bernie Madoff situation.

20          THE COURT:  So the concern I have, then, is how -- how

21   do I ensure that this isn't being double -- double counted,

22   that too much emphasis isn't being given to cooperation?  John

23   Owens, who was in the U.S. Attorneys Office years ago, tried a

24   fraud case in front of me.  And, you know, each case is

25   different, but the defendant in that case did not charge

1    bargain, he went to trial, he was convicted, and a 30-year

2    sentence was imposed.

3            The amount of the loss in that case was 12 million

4    dollars, not 183 million.  It was upheld on appeal by the Ninth

5    Circuit, who found the sentence to be substantively reasonable,

6    given the number of people that were harmed and the amount of

7    the fraud.

8            So, you know, I have to think when I think back on

9    that case and what happened, the aftermath of that case, that

10   the decision of the defendant to cooperate with the government

11   in this had a big influence from the get-go on reducing the

12   exposure that she faced under the federal statutes and under

13   the guidelines.

14           Do you agree with that, or am I misconceiving it?

15           MR. ARNZEN:  I don't disagree with the conception,

16   Your Honor.  The cooperation -- the chance to get the

17   cooperation --

18           THE COURT:  Yeah.

19           MR. ARNZEN:  -- did affect the statutory maximum that

20   Ms. Champion-Cain is facing.

21           THE COURT:  The other thing that's unusual about this,

22   and I'm -- I've looked at this, I couldn't find insight, is

23   that the usual way that substantial assistance is credited is

24   when it leads to the arrest or conviction of others.  In other

25   words, the focus is on criminal cases, not so much civil

1  litigation.

2       Now, I take your point here that restitution is an

3  important aspect of this.  And to the extent the defendant

4  helped, whether in a civil or criminal context, with securing

5  restitution, that's important.  But I'm just not so sure that

6  restitution is realistic at this point, given the amount of the

7  loss that you say.

8       I mean, do you have -- do you believe it's realistic

9  that some portion of this 183 million dollar loss is going to

10 be recovered and repaid?  As you know, I'm presiding in the

11 civil case, too, and there's nothing that has come up in that

12 case that convinces me that there's a lot of money out there to

13 be recouped.  A lot of it's gone.  A lot of these people are

14 never going to be made whole, if they get anything back.  So

15 that's the other question I have for you.

16       MR. ARNZEN:  In retrospect, I don't think we -- we

17 hold a terribly different opinion, Your Honor.  I am not an

18 expert in the civil process at this point.  I don't purport to

19 know how much is available, either through the SEC receivership

20 processes or the private suits that are before Your Honor, and

21 various other courts in the city.

22       But -- but the decision that we made was made at near

23 the outset of this -- of this -- after the discovery of the

24 scheme by the SEC.  We didn't know then what we know now.  We

25 made a measured decision back then to try to put the receiver

1    and the SEC in the best position that they could be in to get

2    that money back.

3              Now, does that work directly into 5K?  I think it

4    does.  I think 5K probably allows for the exercise of

5    discretion by the United States Attorneys Office.  This is a

6    carefully considered decision by Mr. Galvin and myself, the

7    agency, as well as all the way up to the top of the office.

8              As Your Honor likely knows, the Justice manual

9    instructs that we should consider and pursue the highest, most

10   serious charges that we can.  But there are a number of

11   exceptions.  The Justice manual says in the exercise of good

12   judgment, a prosecutor may decide otherwise, as long as they

13   get the approval of the United States Attorney.

14             We've done that.  It's a carefully considered

15   opinion -- decision, and it's one that -- part of which was

16   taken very early on, what to charge Ms. Champion-Cain with in

17   the plea agreement, what charges she would plead guilty to.

18             I will say this.  Our 5K1.1 recommendation is -- is

19   not over the top.  It's three points.  It is -- it's a very

20   modest recommendation, mostly because of the fact that Your

21   Honor pointed out, we don't have other charged folks besides

22   Mr. Torres.  We hope that's coming in the future, but right

23   now, the only person that we can point to is Mr. Torres.

24             THE COURT:  The other thing that I found unusual about

25   it is that, to the extent there was cooperation, there was

1   also, as you point out, obstruction.  In fact, the defendant

2   has pled guilty to obstruction, destruction of records.  It

3   appears from your sentencing memo that she instructed other

4   people to destroy things, wiping out computer records, or so

5   she thought.  And a number of false statements made and

6   encouragement of others to be involved in the obstruction.

7           That strikes me as unusual that someone who's engaged

8   in that behavior would also get a substantial assistance

9   recommendation from the United States.  You can atone for

10  things, but it doesn't erase those things, and they happened

11  here.  Can you explain that?  Because I'm stuck on that a

12  little bit, too.

13          It doesn't foreclose it.  I understand you can have

14  both things, but it just seems, as I said, counterintuitive to

15  me that a person that has engaged in a pattern of trying to

16  cover up things, and has lied, and taken overt steps to cover

17  up things and destroy records over, what, a three-month period,

18  roughly?

19          MR. ARNZEN:  Yes, Your Honor.

20          THE COURT:  Yeah, that that person could then be held

21  up at the time of sentencing to have substantially assisted the

22  government.

23          MR. ARNZEN:  And I'd be happy to discuss it in detail

24  in the right environment, Your Honor.  I can say this.  I think

25  the three points are probably justified solely on her

1    cooperation with respect to the obstruction alone.  In other

2    words, if you obstruct justice, that doesn't take you out of

3    the running for a 5K substantial assistance recommendation.

4            Her assistance solely with respect to that crime, I

5    think, probably -- probably deserves the recommendation that we

6    made.

7            THE COURT:  And is it -- is it the government's

8    position that but for her telling on herself, or admitting what

9    she did, you would not have discovered these things?  You had

10   access to all of these records, presumably.  For example, the

11   escrow accounts.  You knew that the escrow accounts were quite

12   different from what was represented to the investors.

13           And regardless of what she said about it, you could

14   have proved that objectively, right, by putting up the actual

15   documents?

16           MR. ARNZEN:  Yes, we could have, Your Honor.

17           THE COURT:  So I'm -- I guess the question is, should

18   the Court -- and I don't want to second guess you.  I mention

19   this again, I have respect for both of you.  I think you're

20   both very, very bright and conscientious.  None of this is

21   meant to, you know, question the bona fides of the

22   recommendation you make, or as you say, the thought and

23   judgment that went into this.  But I don't know, it seems to me

24   that the need for substantial assistance ought to be part of

25   the equation, too.

1        I mean, if you have an overwhelming case that you can

2   prove and the person says, well, I'll help, I'll tell on

3   myself, that seems to be less valuable than in a case where

4   you're stuck and without a confession, or without some insight

5   from the person, you know, you couldn't otherwise prove the

6   case.

7        And this doesn't seem to be that case.  It seems to be

8   that once you got the records, you saw the escrow documents,

9   saw how different they are and were from what was represented.

10  You followed the money.  You saw where it went, that it wasn't

11  going where it was supposed to, that, you know, you had a prima

12  facie case against the defendant.

13       Is that -- is that a correct way to look at this?  You

14  know a lot more about this case than I do, but that's the

15  impression I get from looking over and reading everything.

16       MR. ARNZEN:  I think that's fair, for the most part,

17  Your Honor.  I don't have much doubt in our ability to prove

18  this case beyond a reasonable doubt, based on the evidence that

19  we received and the FBI received from the SEC when the criminal

20  referral was made.

21       THE COURT:  Yeah.

22       MR. ARNZEN:  There's one thing I do want to make

23  clear, though, and perhaps it is, but just to be sure,

24  Ms. Champion-Cain did not just come in and tell on herself,

25  even with respect to the obstruction of justice.  She is in the

```
1    process of helping us identify others, and has been in the
2    process for a long time now, identifying others who were
3    involved with that effort as well.
4              THE COURT:  Okay.
5              MR. SCHEPER:  Your Honor, may I weigh in --
6              THE COURT:  Yeah, of course.
7              MR. SCHEPER:  -- again, I appreciate it.
8              I just want you to understand the then versus the now.
9    It was in the latter part of August that Ms. Machala and I and
10   Ms. Champion-Cain walked down the street to the Securities and
11   Exchange Commission, and we said, uncle, we give up.  We want
12   to help.
13             And it was two weeks or so later where the SEC and the
14   U.S. Attorneys Office were staring out at the Pacific Ocean,
15   knowing that there was going to be a Fiji or a Hawaii out
16   there, a provable beyond a reasonable doubt case, criminally,
17   or clear and convincing, or preponderance for the SEC.  But the
18   whole point of, I think, their motion, and our concurrence that
19   there should be a motion, is that we came in and we told all
20   from the minute we met Messieurs Galvin and Arnzen.
21             Everything.  We connected all dots.  And there is more
22   to come, and so I don't want you to think this is just about
23   Crispin Torres.  It's not at all.  It's the settlement recently
24   reached.  And, Your Honor, it was two or three months ago, I
25   appeared telephonically at a hearing you had with a lot of the
```

1    civil lawyers.  And I heard you say, "I'm not a kick the can

2    down the road kind of a guy," which I found to be

3    extraordinarily charming and disarming.  And I think when they

4    preview that there's more to come, there is more to come.  And

5    we're going to have a year from today under Rule 35.

6           But I didn't want to kick the can down the road, and

7    have Your Honor, even if modestly, acknowledge that she made

8    their, plural, SEC, receiver, U.S. Attorneys Office, job a lot

9    easier.  And that allowed these two people to do other things

10   for the last year and a half, rather than putting together a

11   case that had she stonewalled, the SEC would still be

12   scratching their head on, how am I going to prove this thing in

13   federal court, where you could have proved it more easily, but

14   they probably couldn't.

15          And so she has helped, substantially.  And I heard you

16   on that court appearance rattle off loads of millions of

17   dollars that had been recovered.  And the process is ongoing.

18   And she 's going to keep doing everything she can to assist in

19   the whole process, receiver, SEC, U.S. Attorneys Office.

20          So I don't want the Court to kick the can down the

21   road to Rule 35, because I think it's an important signal that

22   some consideration beyond what Your Honor has observed about

23   so-called charge bargaining, some consideration in deference is

24   going to be paid to professional and very able prosecutors, who

25   are telling Your Honor, who's -- you know, you're a tough

1    customer, but is telling Your Honor, we stand by our motion.

2           It's more than what it seems right now.  And I'm not

3    going to say who or what else might be down the pipe, but there

4    is going to be more.  But I just don't think that that's

5    sufficient reason to defer to the Rule 35 stage.  I think, you

6    know, however Your Honor decides, she's going to keep helping.

7           But I just make the request -- and the other exception

8    to kick the can down the road is the testing.  Again, she's

9    tried every day for weeks and weeks to try to get the test.

10   She doesn't qualify, technically.  Might tomorrow, depending on

11   what the governor rules, but -- and with that, I'll submit the

12   matter.

13          THE COURT:  All right.  Mr. Arnzen, was there anything

14   else that you wanted to add from the government's perspective?

15          MR. ARNZEN:  I don't think so, Your Honor.  Thank you.

16          THE COURT:  You signalled in advance that some of the

17   victims were here, and did want to make a statement to the

18   Court.  Is that still the case today, that there are victims

19   who want to speak?

20          MR. ARNZEN:  There are victims who would like to

21   speak.  There are more in the courtroom, Your Honor, and a

22   subset of those would like to speak to Your Honor.

23          THE COURT:  All right.  I'll ask you, then, to

24   prioritize them and to call upon them.  If those who want to

25   speak will come up and speak into the mic at the lectern.

1            MR. ARNZEN:  To not create any assumptions, I'm just

2    going to go from left to right, Your Honor.

3            THE COURT:  All right.  Good morning.  If you'll state

4    and spell your name to begin with.  And you can adjust the mic

5    down.

6            MS. GILBERT:  Good morning.  My name is Jane, J-A-N-E,

7    last name is Gilbert, G-I-L-B-E-R-T.  Can you hear me okay?

8            THE COURT:  Yeah.  Good morning, Ms. Gilbert.

9            MS. GILBERT:  Good morning.  I would like Your Honor

10   to know that I am a criminal defense lawyer.  I've been in the

11   state court for almost 30 years, and this is the hardest thing

12   I've ever done in a courtroom.

13           For the past 18 months, I've asked myself over and

14   over why did this happen, how did this happen, particularly to

15   me.  I've known Gina since 1988.  We met at Cal Western Law

16   School.  I was a second year, she was a first year.  We became

17   friends.  There was a group of four or five of us.  Gina moved

18   in with us, was my roommate.  Brought her cat.  We were

19   friends.  And then, you know, Gina got married to Steve.  Flew

20   to Ann Arbor to be at her wedding.  And we continued our

21   friendship throughout all the years in San Diego.

22           I became a lawyer.  She went in the business field,

23   was successful, at least appeared to be.  We shared dinners,

24   Jewish holidays.  We have, you know, pets, you know, we would

25   discuss.  And cared about her family.  Her parents, I knew, her

1    sister.

2          And so for me, when Gina came to me and came to my

3    house with me and my wife, and sat down in October of 2012, and

4    said that she had this great opportunity to make money, I took

5    it as, well, it's Gina.  Gina is a lovely, warm, wonderful

6    person, likes to help people.  So she's offering us an

7    opportunity to, you know, make money along with her, because

8    she said that she was investing and her parents were.

9          So because of my friendship with her, I invested

10   money.  We wrote her a check.  My wife and I were county

11   employees at the time.  We don't have a lot of money, but we

12   saved well.  And so we gave her some money.  And through the

13   years, we just kind of let it go.  And then when we retired

14   from the county, we gave her some more money.  And she kept

15   taking it, and assuring us that everything was fine.

16         And so for me, the hardest part of all of this is not

17   the loss of money, which believe me, I've lost a significant

18   amount of money.  I'm not a wealthy person.  It's the betrayal

19   that I feel from Gina.  I can't call her Gina Champion-Cain, to

20   me, she's Gina, who I've known for over 30 years, who I loved,

21   and I thought loved me.  I thought she was my friend.

22         And it caused me to doubt myself.  I don't think of

23   myself as a naive person.  I'm a criminal defense lawyer.  I

24   read people.  You know, that was what I did for a living.

25   Never saw this coming.  Didn't understand why.  Came here today

1   hoping to get an answer why, listening to Gina while she spoke

2   to you, and discussed the problems she was having financially

3   in 2008.

4        And I'm sure that was true.  But I don't understand

5   the extreme pivot that she did take, and then brought in her

6   friends.  To lie to your friends, to take advantage of your

7   friends, and to perpetuate the lie over and over, I still don't

8   understand.  I'm still, I guess, looking for answers.  I came

9   here wanting to, you know, punch Gina in the face, but I'm

10  listening to her.  I know her.  I mean, I watched the

11  basketball game last night, and Michigan lost.  I know that's a

12  heartbreak for Gina.

13        You know, and part of me wants to give her a hug,

14  because I feel awful that here's where we are at a sentencing

15  hearing, where my friend is facing double digits in federal

16  prison.  It's beyond belief for me.

17        And I'm so saddened by it.  I'm so hurt by it.  And I

18  hope that Gina will turn it around, but I don't know, because I

19  feel like I thought I knew her, and I really didn't.  So I

20  don't know if what she says now is true, because the lies just

21  piled on, and the whole thing was just a fraud.  And it's very

22  upsetting to me.  And I just wanted you to know that, and I

23  wanted Gina to know that.  Thank you.

24        THE COURT:  All right.  Thank you.

25        MS. HEIDRICH:  Good morning, Judge Burns.

1          THE COURT:  Good morning.

2          MS. HEIDRICH:  My name is Christine Heidrich.  And I

3    appreciate everything that you've said --

4          THE COURT:  Can you spell your last name?

5          MS. HEIDRICH:  H-E-I-D-R-I-C-H.

6          THE COURT:  All right, Ms. Heidrich.

7          MS. HEIDRICH:  So I really appreciate a lot of what

8    you've said today, because that's a lot of the questions that

9    I've had.  I think she should honestly just straight up, 30

10   plus.  Like, there wasn't -- I don't understand how they could

11   decide that there's only three cases, or whatever -- I'm not

12   even accustomed to court.  So she should have them all.  And I

13   really question, if it's only Crispin that she's turned in, and

14   he turned in her.

15         She has had 18 months to cooperate, and I haven't seen

16   any cooperation, other than that.  Them telling us that

17   something is coming, it should have already been here.  We're

18   in court, as you know, in civil, spending money, our time,

19   listening to these depositions, listening -- it's

20   heartbreaking, right, to hear all that, when you can hear the

21   lies and the coverup everywhere.

22         There's -- I've gotten to a place in life, which is so

23   sad, because I always wore -- people told me I wore

24   rose-colored glasses, and I don't anymore.  You know, it's just

25   heartbreaking.  And I truly -- Gina is a big reason why.  I

1    thought she was a good friend of mine.  I trusted her.

2            It was nice to meet another businesswoman.  We had a

3    lot of conversations.  And I just think about the moment I met

4    her, she already knew that she was going to take my money,

5    my -- anybody else's money.  She had a plan.  And from the

6    beginning, and that's not just eight years, she had that

7    before.  She had to create this plot, and find people, or they

8    found her.  Who knows how it went.

9            But for her to be up here now and saying that she's

10   trying to be cooperative, it doesn't mean anything to me.  She

11   never should have been in this situation.

12           And for it to be hard times, I didn't know the '08

13   situation.  She started this in '12, and continued it until

14   '19.  It's -- honestly, it's just so disrespectful for all of

15   us in this room, and all of the money we've lost, and all the

16   time and energy, for her to even make a statement like that.

17           And I'm confused over here.  I'm watching the

18   prosecutor's leg shaking and he's nervous.  He almost seems

19   like he's on her team, and I would not be surprised.  That is

20   how she works.

21           She's amazing.  She's skilled.  I was in awe of her.

22   I'm still in awe that someone -- I wonder how -- how can

23   someone treat people like this and pretend.  You can't.  That

24   is who she is.  She is evil.  This is a very bad person.  And

25   she -- like, she's going to help people with math and English.

1    Why aren't you -- why weren't you out there already doing that,

2    instead of taking almost 400 million dollars from the people.

3              So where I stand is the biggest sentence that she can

4    get is what she deserves.  And that's all I have to say.

5              THE COURT:  All right.  Thank you.  Good morning.

6              MR. SMITH:  Good morning, Your Honor.  My name is

7    Bruce Smith.  There have been scammers throughout history.  We

8    read about them all the time in the paper.  It takes a certain

9    type of person mentally to create these scams.  Bernie Madoff

10   comes to mind, recently.  But it takes somebody especially

11   different to go to the next level, and that's to scam people

12   who are closest to you.

13             Gina did that.  I've known Gina for 30 years.  We've

14   traveled together.  We socialized on many occasions with she

15   and her husband.  And then she sat down with me in 2011, looked

16   me in the face, and lied to me.  Told me about this great deal

17   that she had put together.  And because of our relationship,

18   because of her skills as a businesswoman, I took that all in.

19   I believed her.

20             She looked me straight in the face, sent me e-mails,

21   phone calls, ha-ha-ha, we're making so much money.  This is the

22   greatest thing ever.  To me, her friend.  I think what she did

23   was unforgivable.  She has no remorse.  She's only cooperating

24   with the Court to reduce her own sentence.

25             What, you're going to help get back some -- a little

1    fraction of the money that you stole from all these people?

2    And that's going to reduce your sentence?  That somehow makes

3    you better than you were over the last eight, nine years?

4           It doesn't fit for me.  It's only for herself, just

5    like stealing the money was just for herself.  I hope the Court

6    takes this into account, and gives her the maximum sentence

7    that she deserves.  She's betrayed all of us.  Thank you.

8           MS. GONZALEZ:  Hello, Your Honor.

9           THE COURT:  Good morning.

10          MS. GONZALEZ:  Good morning.  My name is Wendy

11   Gonzalez.  My last name is spelled G-O-N-Z-A-L-E-Z.  I am

12   coming from LA, so as you can see, this is kind of a big deal

13   for me.

14          I wasn't a direct investor of her initial projects,

15   but I invested in her -- in the project for her retail stores,

16   which is, like, Luv Surf.  I did not want to take on this

17   project, because I was diagnosed with cancer.  And I did not

18   want to work and I wanted -- I had saved money for my

19   treatments.  I had to pay out of pocket because my insurance

20   wouldn't cover everything, and I had that money for my cancer

21   treatments.

22          I did this as a favor for a friend.  She -- so she got

23   referred to me with Jessica White, which is the girl involved

24   in the designer -- in this project.  I had to rush this

25   collection.  I got paid part of it.  But it just seemed really

1    weird to me how it was going to go from wholesale to retail.

2    The margins weren't right.  I jokingly told Jessica, like, this

3    seems like she's laundering money.  This doesn't seem right.

4            It's -- you know, and I was working for free.  I

5    wasn't getting paid, because, basically, you know, Jessica

6    wasn't transparent.  It seemed like that whole energy from Gina

7    transcended into -- into her employees, like, the

8    nontransparency.  I kept on asking for my money every time I

9    would, you know, basically finish a project.  And it was,

10    like -- and I needed this money so bad.  I needed it, because I

11    had to pay my people.

12            And all the money that, at the end, I didn't get paid.

13    And I was devastated, because I thought to myself, like, if I

14    don't get these treatments, I might not make it.  I had to

15    borrow money to pay all my people.  And I had to -- I have to

16    continue paying all the -- all the inventory, I have it in a

17    warehouse, and I have to pay for it.  I can't get rid of it.

18            It's stuff that I don't, you know, normally make for

19    people.  And so I'm here.  It's been 18, 19 months.  And

20    it's -- you know, it's just a trickling effect.  It affected my

21    life completely.

22            And, you know, the mistakes that we make, the sins

23    that we make, we don't realize how it can really affect so many

24    people, so many people.

25            And, you know, this is -- this is -- I can't believe I

1    would be involved in something like this.  And I mean, jail

2    time is necessary, so that she can reflect on what she's done,

3    and really see.  Sometimes we have to go -- really fall down to

4    really realize who we are, and what we've done in this world.

5           And I just -- I need to be compensated financially for

6    this.  I really do.  I owe people money.  I need her to

7    cooperate with that.  I have lots of e-mails, e-mailing the

8    receiver, like, I need this money, please.  Is there anything I

9    can do.

10           I know they were frozen, the accounts, but I just -- I

11   really need to be compensated.  Thank you so much.  Have a nice

12   day.

13           MR. ARNZEN:  I think that's all the victims who wish

14   to address the Court, Your Honor.

15           THE COURT:  All right.  Is there anyone else here that

16   wants to make a statement -- a victim, I'm talking about,

17   anyone else?  All right.  Seeing no hands.

18           Anything else from either -- either party?

19           MR. SCHEPER:  No, Your Honor.

20           MR. ARNZEN:  No, Your Honor.

21           THE COURT:  The sentencing process in federal court

22   begins with a correct calculation of the sentencing guidelines.

23   These guidelines, of course, are advisory, but the Court is

24   reminded by both the Supreme Court and the Ninth Circuit that

25   they still remain central to the sentencing process.  And I'm

1    to keep them in mind throughout the -- throughout the

2    sentencing, although, as I said, they are advisory guidelines.

3    I'm not bound by them.

4         The Court adopts the guideline calculations set forth

5    in the government's sentencing summary chart.  The base offense

6    level is a 6.  Because the loss here was 183 million dollars,

7    and no one appears to dispute that, there's a 26 level upward

8    adjustment, which takes this to a 32 under the guidelines.

9         400 victims -- over 400 victims were involved, so it

10   meets the threshold for a 2 point adjustment for over 10

11   victims, which takes this to a 34.

12        The defendant used a sophisticated means in carrying

13   out the fraud scheme, that adds 2 points, and takes us to a 36.

14   A financial institution was also involved.  That is considered

15   a two-level adjustment, and takes us to a 38.

16        The government has recommended a role adjustment, an

17   upward role adjustment, meaning that the defendant is an

18   organizer, leader, supervisor in this fraud scheme.  That adds

19   two levels, and takes us to a 40.

20        And then as we've talked about, the defendant, as the

21   case was being -- unfolding and being investigated, obstructed

22   justice.  So that takes us up to 42.

23        The Court finds that 42 is the adjusted upward offense

24   level.  Now, for the downward adjustments.  3 points come off,

25   as the defendant's accepted responsibility.  She has pled

1    guilty.  She could have drawn this out.  She did not.  She's

2    entitled to that credit, so we're back to a 39.

3            And then she's in criminal history category I.  She

4    has no prior criminal record.  And when you look across the

5    matrix at a 39, in criminal history category I, the guidelines

6    that she faces for the offenses are 262 to 327 months.

7            In this case, though, there's a cap.  And the cap is

8    supplied by the charge bargain that the government entered

9    into.  The defendant was permitted to plead to three counts.

10   It carried no more than five years, so a total of 15 years or

11   180 months.

12           The guidelines provide that when the guideline range,

13   in this case, 262 to 327 months, is longer than what the

14   statute provides, that the statutory maximum becomes the

15   guidelines.  So rather than 262 or 327, or some place

16   in-between that number, the defendant's guideline is 180

17   months.  And I have that in mind.  That is by operation of

18   Section 5G1 of the guidelines.

19           The government's recommended two additional reductions

20   in sentence.  We've discussed one.  One is for assistance.

21   They've recommended a three-level adjustment there.  And

22   they've recommended a combination of circumstances

23   adjustment -- departure, I should say, of one level.  So a

24   total of four levels.  And that, roughly, if granted, shaves

25   off about 50 months from the statutory maximum of 180.  The

1    government's recommendation here is 130 months.

2          The defense has asked me to consider additional

3    departures.  For one, they believe the Court should give the

4    defendant additional credit for the cooperation, pointing out

5    that it saved the receiver, who's trying to recoup losses in

6    this case, a great deal of time and effort to have the

7    defendant cooperating, that after realizing that it was futile

8    to fight the case and to continue obstructing the

9    investigators, that the defendant did a complete turnaround and

10   has been cooperative since then.  So I have that in mind.

11         The Court typically -- I -- I should say, typically,

12   defer to the prosecutors.  I also take into consideration what

13   the defense says, but the prosecutors are in the best position,

14   I think, and I say this from experience, to know what the value

15   of the defendant's cooperation is.  And so typically, I defer

16   to the prosecutors on that.

17         The sentencing guidelines provide the Court should

18   defer to the prosecutors.  They know much more about this case

19   than I do.  My knowledge of the case is derivative from what

20   I've read, what I've been told, what's been filed.  I haven't

21   actually spoken with people historically connected to the case,

22   as the prosecutors have.  So I have that in mind.

23         Now, at the same time, I'm not bound by what the

24   prosecutors recommend.  The sentencing decision is up to the

25   Court, and I will give respectful consideration to their

1    recommendations, as well as those made by the defense in this

2    case.

3            The Court can treat the recommendations for a lower

4    sentence in two ways, either as a formal departure, where I

5    depart and find that the guidelines are actually lower, or I

6    can treat them as what's called a variance.  And the variance

7    comes into play when I consider a number of other factors.

8    It's the second part of the sentencing process here.

9            In this case, I elect not to treat them as departures.

10   I will treat them as a basis for a variance in the sentence.

11   It's a technicality.  As I said, it just affects the guideline

12   range.  But for the record, I find that the defendant's

13   guideline range is 180 months.  And I decline to depart on

14   either of the bases offered by the government, either

15   substantial assistance or combination of circumstances.  More

16   on that later.

17           Once the Court determines what the guidelines are,

18   there are a number of other factors.  And these factors

19   probably have more meaning and common sense to every day

20   people.  These are under the statute 3553 of Title 18.  So the

21   Court, after determining what the guidelines are, then turns to

22   these factors, and reassesses what the sentence should be.  And

23   this is where, if there's to be some change from the

24   guidelines, variances and judgment come into play.

25           Among the factors, I'm to consider the nature and

1    circumstances of the offense, and the history and

2    characteristics of the defendant.  Here I find that this is a

3    very serious offense.  Its scope and duration, I think, are

4    very, very aggravated.  The fact that this was perpetrated over

5    a seven or eight year period, I think makes it a much more

6    serious offense than most -- most similar fraud type cases,

7    which are usually much, much shorter.

8         Usually the -- either the fraud ends or the person

9    gets caught.  That didn't happen here.  And I asked the

10   government about the number of different crimes that may have

11   been involved here.  Certainly in the dozens, but maybe even in

12   the hundreds.  Each time a letter is sent, each time an

13   electronic transmission from the computer goes out, and the

14   purpose is to defraud someone, that's a new and different

15   charge.

16        And I find that the defendant's crime was committed

17   over a long period.  There were separate episodes involving

18   different victims.  It's not the same person, it's not the same

19   crime.  Each time, as money came in and new victims were

20   recruited, the defendant re-offended.  And as I said, this went

21   on for seven years.

22        Today, I even have some greater insight into it.

23   These weren't just strangers.  These weren't just people

24   looking for investment opportunities, hoping that they could

25   get rich, looking at something that looked like a sure thing.

1    12 percent back on your money, and only you could touch the

2    money.  No one could get to it.  That's what they were assured.

3            What I didn't fully realize today is the personal

4    relationship that existed between the defendant and many of the

5    people who were victimized.  And, Ms. Champion-Cain, I have to

6    tell you, that that is a level of deceit and betrayal that

7    wasn't -- I wasn't fully aware of until I heard from these

8    people that have known you all these years.

9            You know, I think it was a very callous thing on your

10   part to draw them in.  Not that it's okay to -- to defraud

11   strangers or investors that you don't know, but these

12   relationships that have been forged over all these years, these

13   people spoke about knowing you 30 years or longer.

14           And, you know, attending your wedding and knowing you

15   personally.  And then to victimize those people, I just think

16   that that is tremendous callousness here.

17           The duration of the scheme, the number of crimes

18   involved, I think all reflect the seriousness of the offense

19   here.  And they make it a very, very aggravated offense.

20   Certainly the losses is a tremendous loss.

21           Folks that have spoken, I think maybe hold out some

22   hope that they're going to get some of this money back.  I

23   don't know.  I don't know if that's in the cards or not.  I

24   know the receiver is working diligently, but let's face it, a

25   lot of the money's been spent.  And, you know, been spent in a

1    way that can only be characterized as avarice.  Extreme greed
2    on the defendant's part.  $20,000 golf cart, boxes at the Padre
3    stadium.  Boxes at the Chargers stadium.  That money is gone.
4    That'll never be recovered.  Very high salary, jewelry.  All
5    personal things, personal enrichment of the defendant at the
6    expense of these unwitting victims.  That makes this, in my
7    judgment, a very, very serious case.

8          I'm to consider also the history and characteristics
9    of the defendant.  I'm impressed with Ms. Champion-Cain's
10   background.  She's bright.  She's articulate.  She's -- comes
11   across as a very attractive person.  Obviously, won the hearts
12   and the loyalty of many people that have known her over the
13   years that saw these same traits.  And yet there's a chameleon
14   aspect to this, because they don't really know her.

15         They've all been deceived by her over the years.  And
16   Ms. Gilbert, in particular, who's known her all these years,
17   and knew her in such a personal capacity, must really feel
18   betrayed.  Not alone, but must really feel betrayed by her.

19         She's smart.  She's had advantages in life.  It looks
20   like she comes from a good family.  Couldn't make the business
21   work altogether, but I think she knows business.  And, you
22   know, I have to say, I give her some credit for finally, you
23   know, waking up and saying, look, this obstruction and
24   continued denial of this is not going to do me any good.  I
25   mean, I have to, at some point, cut my losses, beg for mercy,

1    and that's what she did.  And I understand that.

2          The character letters that came in are helpful, I

3    think, in completing the profile of her.  You know, it's seldom

4    that -- that this is a binary assessment.  That somebody is

5    either evil or they're good.  There's a combination of that, I

6    think, in everyone.  And I have read carefully the letters.  I

7    understand how lawyers who have been able to reach settlements

8    in this case are appreciative that she's cooperated.  So I do

9    have that in mind.

10          The Court is to impose a sentence that promotes

11   respect for the law.  And here's where I have some trouble in

12   giving as much credit to the defendant's turnaround, belated as

13   it was, as the government's given.  First, let me say this,

14   because this is an important point.  We don't just get from 262

15   to 327 automatically.  And to his credit, I think Mr. Arnzen

16   said, look, we had in mind some of the help -- helpfulness that

17   the defendant was providing at the point we decided to charge

18   her with only three crimes, essentially relieving her of being

19   subject to a guideline that's much, much longer.

20          The other thing that I think is important to say is

21   that the guideline range is a vast range, 262 to 327 months.

22   And there's no presumption where a person falls within that

23   range.  It could have been 327, it could have been at the low

24   end.  But if you take either of those figures, and compare them

25   to where she's at today at 180 months, it's a substantial,

1    substantial reduction already that's been given.

2            And I don't fault the government for this, but I want

3    everybody to understand.  It's as a result of the decision that

4    the United States Attorneys Office made to charge her and allow

5    her to plead to three crimes, and forget all the rest, that

6    we're at this point.

7            And that decision, the prosecutors concede, did

8    contemplate, to some extent, the cooperation that the defendant

9    is giving.  I think one of the things that would be wrong for

10    me to do is to double up on that factor, the cooperation

11    factor, to the extent that the defendant gets double credit for

12    that.  Substantial credit has already been given for that.

13    Substantial credit in the form of cutting her exposure, from,

14    at the low end, 262 down to 180 months.  At the high end, 327

15    down to 180 months.  So I have that in mind as well.

16            The Court is to promote respect for the law.  I think

17    some of the victims who spoke today touched on this.  And I

18    understand the instinct.  If you've ever been the victim of a

19    fraud, you know the hopelessness that follows when you realize

20    what's happened to you.  The money is gone.  No prospect that

21    you're going to get it back.  You question your own judgment.

22    You feel foolish about getting sucked into something.

23            But there's just this hopelessness.  And you've got to

24    look to others, a receiver, or the U.S. Attorneys Office, or

25    the Court, or somebody else.  And, you know, vindication never

1    really comes.  I doubt it'll be satisfactory to any of the

2    victims that the defendant will be in jail, as opposed to

3    getting their money back.

4         So I have that in mind as well.  I have the need to

5    promote respect for the law.  And to make sure that the people

6    that are part of this have respect for this process and the

7    law, not just the defendant, but the victims of her crimes.

8         And then there's the question of just punishment.  You

9    know, what's a fair measure of punishment for this.  This is a

10   tremendous, tremendous fraud.  The government's characterized

11   it in press releases and in statements before me as probably

12   the biggest fraud in the history of the district.  That's

13   saying something.  This is a big city here.  And to have the

14   biggest fraud in the history of our district that encompasses

15   San Diego is a monumental crime.  It's a monumental crime.  183

16   million dollars lost.  Not just the total amount that went in

17   and came out, but lost, with very little prospect that any of

18   that's going to come back.

19        I mean, one of the things I'm to consider is

20   restitution, and trying to make restitution.  And certainly a

21   restitution order will follow.  But I don't want to give false

22   hope to any of you that have lost money.  I don't want to give

23   you false hope.

24        It's seldom in these cases, with this amount of loss,

25   that the victims get back more than pennies on the dollars that

1    they've lost.  So the prospect of restitution here, although

2    I'll order it, is not strong.

3            I want to say this, too, on 180 month term, a 15-year

4    term, we're talking about just punishment, how much time

5    defendant would actually serve in prison.  Under the current

6    law, the defendant gets 15 percent off for good behavior in

7    custody.  So that's about two and a quarter years on an imposed

8    15-year sentence.  It would cut the sentence down, obviously,

9    to 13 years or so, maybe less.  12 years and three-quarters.

10           And then the Bureau of Prisons, I'm also aware, has

11   the option, and frequently exercises it, to release someone up

12   to a year before the completion of the pronounced sentence in

13   the case.  So what are we talking about realistically here,

14   with either of the recommendations, the one from the defense or

15   the government.  We're talking about -- not that being the

16   actual time the defendant will do in custody, but that's

17   subject to the 15 percent reduction.

18           Again, you know, that's by operation of law.  I

19   mention that only because it implicates the concept of just

20   punishment, just how long a person is going to be in custody.

21   Not some phoney number.  Texas, Oklahoma, places like that, you

22   see these sentences that are 400 years.  And then the person's

23   out after 10 years.  And you say, wait a minute, I thought this

24   was a 400-year sentence.  I want to put that in perspective.

25   Our credit system in the federal court is not -- not the same

1    as those.

2            The Court should consider deterrence as well.  I think

3    the defendant now has been chastened.  I think she's

4    intelligent and smart enough to realize that, you know, she's

5    going to be closely followed.  Frankly, Ms. Champion-Cain, you

6    know, I don't know if you have a future in business.  You know,

7    with this in your background, I don't know that you'd be able

8    to recover and start a business that anyone would invest in.

9            And I -- you know, I'm not cynical about what you've

10   said.  I think, now that you've had a chance to reflect on all

11   of the mistakes that you've made, not just, you know, sucking

12   all these people into this investment, but the obstruction of

13   justice that followed, I don't think you'd do it again.  You're

14   smarter than that.

15           But deterrence also implicates general deterrence.

16   It's a warning to other people that there are consequences when

17   you take other people's money under false pretenses.  And the

18   consequences will be visited on you if you get caught.  Whether

19   we can get the money back or not, there's a -- there's a

20   consequence to be paid.  And I have that in mind here, again,

21   remembering that we're talking about 183 million dollar loss.

22           The Court's to protect the public from future crimes

23   of the defendant.  I think I've spoken to that.  The kinds of

24   sentences available, well, no one's asking for probation here.

25   The defendants are asking for a substantial time in custody,

1   too.  And I have in mind the defendant is 57 years old now,

2   right?  57?

3        And, you know, custody is -- is tough.  Merle Haggard

4   used to say, the joint is a bad place to be.  And he was right

5   about that.  It's not easy for anyone, and it's particularly

6   difficult for people that are older or unaccustomed to that

7   type of thing.  We're not dealing with somebody that has been a

8   criminal her whole life, and has tasted jail before.  So I have

9   that in mind.

10        At the same time, I have to say that, you know, she

11   started this -- she started this crime in her 50s.  She picked

12   the date and time that this would begin.  She picked what age

13   she'd be at when she perpetrated this scheme and continued it.

14        And it continued, you know, well into her mid-50s.  I

15   mean, if this lasted through 2019, she was 55 years old and

16   still perpetrating this scheme.  And so, you know, while I'm

17   sympathetic to her age and the difficulty of being in custody,

18   I think she assumed that risk when she engaged in the behavior

19   she did at the age she was at the time.

20        In considering the kinds of sentence, as I mentioned

21   earlier, other cases -- every case is different, of course, and

22   there were aggravating factors in the case that I referred to,

23   but here, the loss involved here, the loss really emasculates

24   anything I've seen before.  And as I said, I don't have any

25   great confidence that that's going to be mitigated by

1    restitution.

2          I know the receiver is working diligently to try to

3    recover whatever can be recovered, and has done that.  But as

4    Mr. Arnzen says, that, you know, there's a cost to that.  The

5    receiver gets paid, the receiver has lawyers and accountants

6    and others that have to be paid.  And all of that comes out of

7    part of what's recovered.

8          And in terms of not kicking the can down the road,

9    Mr. Scheper, I'm trying to keep those costs down to maximize

10   the amount that the victims will get from what's found.  So I

11   have all of that in mind.

12         Let me say this about the recommendation for

13   assistance in this case.  First, the government says there's

14   going to be another recommendation, that they

15   anticipate -- you've heard this nomenclature Rule 35.  That's a

16   motion that's made to the Court after sentence is imposed to

17   reduce the sentence, because a defendant has continued to

18   cooperate afterwards.  And I think both sides anticipate that

19   they're going to bring such a motion.

20         It doesn't foreclose me from giving credit now, but I

21   have to say, I'm dubious about the credit here.  I really am.

22   I don't want to be pejorative.  I don't want to be flip about

23   this, but, you know, when the person who you recommend for a

24   role enhancement, as an organizer, leader, supervisor, then

25   turns on underlings, like Torres, it just -- something about

1  that strikes me as not the way that this section is intended to

2  work.

3           I'm not saying legally, I'm just saying, practically

4  speaking, you know, it's like trawling for minnows with a

5  shark, right?  You wouldn't do that.  I mean, it's usually the

6  little fish that brings in the big fish, not the other way

7  around.  And yet, that's the situation we're in.

8           She told on Mr. Torres, so she should get credit for

9  that?  And I know there's other cooperation implicated, but we

10  haven't seen it yet.  Two people have been charged.  One's been

11  sentenced.  And one is here for sentencing today.

12           Even -- I have to say this.  Even to the extent that I

13  would give credit for that now, and I -- I do respect and

14  appreciate that both the prosecutors and defense counsel, too,

15  negotiated this, believe it's warranted.  Even were I to give

16  credit for that, I would find that an upward adjustment -- an

17  upward variance would be warranted, because of the aggravating

18  factors in this case.

19           In the end, this comes down to a balancing of

20  aggravating and mitigating factors.  So even if I were to go

21  down to 130, I would find that a sentence going back up, taking

22  into account the aggravated portion of this, is warranted.

23           So all that to say, in my considered judgment, the

24  guideline sentence which I'm to keep in mind throughout this

25  process, even after the analysis that I've gone through under

1   the statutory factors, the guideline sentence is the one that

2   makes the most sense to me.  I think it's the reasonable

3   sentence that accounts for everything.

4           And the Court, therefore, finds that a sentence of 180

5   months is reasonable and warranted, and is the sentence of the

6   Court.

7           That implicates consecutive sentences.  I find that

8   the consecutive sentences on the three counts are warranted in

9   this case.  They're crimes different in nature, involved

10  multiple victims, separate episodes.  All of those things, in

11  my judgment, justify a sentence that runs consecutive, rather

12  than concurrent.

13          So the Court imposes, on the three counts, five years

14  each, for a total of 180 months.  And the sentence is to run

15  consecutive to one another.

16          Ms. Champion-Cain, you'll face a period of supervised

17  release once you complete the sentence in this case.  And

18  recommendations have been made for conditions of supervised

19  release.  Let me recite those now.  You'll get a copy of this

20  judgment that will also contain them.

21          Let me be specific that the 180-month sentence is

22  imposed pursuant to 5G1.2(b) and (d).  Those are the technical

23  sections that deal with the consecutive nature of the three

24  counts.  This, by the way, is the recommendation of the United

25  States Probation Department, which I choose to follow.

1          The defendant will also be on supervised release for a

2     period of three years on each of the counts.  The supervised

3     release term will run concurrently, rather than consecutive, so

4     it's a total of three years.

5          Here are the conditions.  She's to report all

6     automobiles she owns or drives to the probation officer.  She's

7     to submit to a search of her person, her property, her

8     residence, and her computer, and her papers, other electronic

9     communications, or data storage devices by the probation

10    officer.

11         She's to provide complete disclosure of her personal

12    business financial records to the probation officer.  She's to

13    notify the U.S. Attorneys Office Collection Unit of any

14    interest in property that she obtains directly or indirectly,

15    including any interest obtained under any other name or entity,

16    including a trust, partnership, or cooperation -- corporation.

17         Likewise, she's to notify the U.S. Attorneys

18    Collection Office before transferring any interest in property

19    that she owns directly or indirectly.  Again, including any

20    interest held or owned under any other name, entity, trust,

21    partnership, or corporation.

22         Ms. Champion-Cain, you're not to open new checking

23    accounts, or incur credit charges, or open lines of additional

24    credit without preapproval of the probation officer.

25         The guidelines call for a fine of up to $250,000, or

1    twice the gain or loss.  In this case, the Court declines to

2    impose a fine.  I think, first and foremost, if there's money

3    to be recovered, if the defendant has any money, that should go

4    back to the victims in the form of restitution.

5            A final restitution figure has not been set yet, is

6    that correct?

7            MR. ARNZEN:  That is correct, Your Honor.

8            THE COURT:  We put off the restitution hearing as to

9    the other defendant for some period of time.  I'd be inclined

10   to do that here.  If the parties can come to a figure on

11   restitution, I'll incorporate that.  Otherwise, we can have a

12   follow-on hearing to determine the restitution amount.  Is that

13   agreeable?

14           MR. SCHEPER:  Yes, Your Honor.

15           MR. ARNZEN:  Yes, Your Honor.

16           THE COURT:  So the Court imposes no fine.  There's

17   also a hundred dollar penalty assessment per count, which I do

18   impose.  I find the defendant can work in prison industries and

19   pay that $300 off.

20           So those are the conditions of supervised release.

21   There's been a recommendation for Dublin.  The Court embraces

22   that recommendation.  I recommend that Ms. Champion-Cain be

23   able to serve her sentence at Dublin, California.

24           There's also been a recommendation that the defendant

25   be permitted to self-surrender.  Mr. Scheper, this is not

1    peculiar or unique to your client.  I think you knew that.  You

2    know, you've mentioned that I'm, what, a tough cookie or tough

3    customer.  I don't consider it tough.  Today is the day that

4    sentence was imposed.

5         Your client went to bed last night expecting that

6    judgment would be imposed, and she would hear it today in the

7    district court at least.  This is the final thing that happens.

8    And, you know, I think the idea that someone then begins

9    serving their sentence when sentence is imposed has been

10   historical and traditional.

11        Now, you know, we've gotten away from that.  And

12   you've pointed to reasons why it's necessary here, for her to

13   get a COVID shot.  I'm not indifferent to that, but I want to

14   share with you, all of you, an e-mail I received from our chief

15   judge yesterday.

16        It comes from the MCC in San Diego.  They've just

17   received a supply of COVID vaccinations.  And every inmate will

18   be vaccinated there.  So Ms. Champion-Cain need not be released

19   now to go get a COVID vaccination.  She'll have access to one

20   at the MCC.

21        Again, I make the point to you and to everyone that

22   this is not peculiar to her.  I don't have any personal angst

23   toward her, but it's an unusual situation where someone is not

24   remanded in my court at the time of sentencing.  I do it

25   routinely.  And I think you were on notice of that, all of you

1  were.

2          So with all respect to the request, I decline at this

3  point to continue her on bond.  The sentence has been

4  pronounced.

5          MR. SCHEPER:  Your Honor, no disrespect intended by

6  asking.

7          THE COURT:  No.  No, and I didn't take it that way,

8  but I wanted to make sure that you didn't think that I was

9  singling her out.  If you ask around, and I don't know that I'm

10 unique, but --

11         MR. SCHEPER:  I did.  I did, Your Honor.

12         THE COURT:  But, yeah, I got that advice from my

13 predecessor, Howard Turrentine.  He had a very unfortunate

14 experience years ago, nothing to do with this case, no concern

15 like this here, but he released somebody.  And the guy he

16 released got out and killed his parents before he

17 self-surrendered.  And Judge Turrentine told me that that

18 always haunted him, that if he made the decision that he

19 thought was right, which was the person should go in, the

20 parents would still be alive.

21         Now, again, no comparison here with Ms. Champion-Cain,

22 but it informs my judgment on this.  And it is the historical

23 and traditional way that someone who's been sentenced begins

24 serving their sentence after it's pronounced.  And that's

25 what's happened here.

1          So with all respect to the request, she can get her

2    shot in the MCC.  She will get her shot, if she wants it.  But

3    her conditions of release are now revoked.  Her bond is

4    exonerated, and she'll be remanded.

5          Tell me about the waiver of appeal provision.  I think

6    your guidelines went up to 180, did they not?

7          MR. ARNZEN:  They did, Your Honor.

8          THE COURT:  So in your view, has appeal and the

9    opportunity to collaterally attack the conviction been waived

10   by pronouncement of this sentence?

11         MR. ARNZEN:  Under these circumstances, it has not

12   been waived, Your Honor.

13         THE COURT:  What are the circumstances?

14         MR. ARNZEN:  A sentence in excess of -- oh, I'm sorry,

15   Your Honor.

16         THE COURT:  I thought it was high end of your

17   guidelines, which would have been 180.  Do you have a view on

18   this?

19         MR. SCHEPER:  Your Honor, I'm sorry, I was paying

20   attention to the marshal.

21         THE COURT:  Okay.  I'm asking if the waiver of appeal

22   provision that was part of the plea agreement has been

23   triggered.  I'm unsure about that.  I think the government's

24   guidelines were 180.  And I think their plea agreement says, as

25   long as the Court does not impose a sentence above the high end

```
1    of the guidelines, appeal and collateral attack are waived.

2           MR. SCHEPER:  That's my memory of the guideline -- of

3    the plea agreement, yes.  But we can probably have confirmation

4    momentarily by someone significantly more intelligent than I.

5           THE COURT:  Well, I know the prosecutor is looking at

6    it, too.  I just want to be sure to be advise --

7           MR. SCHEPER:  I didn't mean that guy.

8           THE COURT:  No, Ms. Machala.

9           MR. ARNZEN:  Your Honor, I'm uncertain.  We did

10   recommend a departure under the guidelines under 5K, and the

11   Court declined that.

12          THE COURT:  What page?  Tell me what page it is on

13   your plea agreement?

14          MR. SCHEPER:  It's page 24, Your Honor.

15          THE COURT:  Well, the high end -- I mean, there's

16   ambiguity here.  It says, the only -- the defendant waives and

17   gives up all right to appeal or collaterally attack every

18   aspect of the conviction and sentence, including any

19   restitution order.  The exceptions are the defendant may appeal

20   a custodial sentence above the high end of the guideline range

21   recommended by the government at sentencing.  The high end is

22   180 here.  I know you've asked for either departures or

23   variances below that, but the high end, as you calculate it, is

24   180 months.

25          MR. SCHEPER:  I think I remember hearing that the
```

1    government recommended 130 months.

2         THE COURT:  They did, but it was either through a

3    departure or -- which I declined, or a variance.  But your

4    guideline calculations ended up at the high end of 180.

5         MR. SCHEPER:  The guideline range recommended by the

6    government.  So you're reading that to carve out of that

7    departure motions, right?

8         THE COURT:  So you believe that there is a right to

9    appeal, then, on this?

10        MR. SCHEPER:  I'm considering it for the first time in

11   my life.

12        THE COURT:  What's your view, Mr. Arnzen?

13        MR. ARNZEN:  I tend to think, Your Honor, that the 5K

14   recommendation is a recommendation under the guidelines.  I

15   know you've recharacterized it, but it was our recommendation

16   that there would be a 3-point departure.

17        THE COURT:  Okay.  Okay.  So Ms. Champion-Cain, I'm

18   not imbuing you with these rights.  The government concedes

19   that you have them.

20        If you think the sentence is too long, or if you think

21   I made a mistake in calculating this sentence, you have a right

22   to appeal.  And a higher court, a three-judge panel, will look

23   at everything that's been said.  They'll look at all of the

24   paperwork in the case.  And they'll determine whether I made an

25   error.  And if I did, they'll send it back to me.

1          What you need to know today is this.  You have 14 days

2    if you want to file an appeal.  Discuss this with your counsel,

3    and they can file the appeal for you.  But that appeal has to

4    be filed in the next 14 days, if you want to challenge the

5    sentence that I've imposed.

6          Do you understand?

7          THE DEFENDANT:  Yes.

8          THE COURT:  Anything else?

9          MR. SCHEPER:  Nothing from the defense.

10          MR. ARNZEN:  Your Honor, only this.  The government

11    requests that the Court enter an order of forfeiture orally,

12    and include it in the judgment and conviction.  And we can

13    submit a proposed order shortly.

14          THE COURT:  All right.  Have you shown it to counsel?

15          MR. ARNZEN:  I do not have the proposed order ready

16    yet.  I was going to wait and listen, Your Honor.

17          THE COURT:  And the items subject to forfeiture would

18    include what?

19          MR. ARNZEN:  I think there was a general provision in

20    the plea agreement.  There was a financial addendum that

21    addresses forfeiture, Your Honor.  It's at page --

22          THE COURT:  All right.  The parties contemplated a

23    forfeiture order as part of this.  The Court will include an

24    oral pronouncement that that'll be part of the judgment here.

25    And it'll be reduced to writing in all of its particulars, and

1    attached to the judgment.

2             Does that do it, Mr. Arnzen?

3             MR. ARNZEN:  It does from our perspective, Your Honor.

4             MR. SCHEPER:  Yes, Your Honor.

5             THE COURT:  Okay.  Good to see you again.  Thank you

6    all.  We're in recess.

7             I'm sorry, one other thing.  We need to set the

8    restitution hearing.  May we do it on same day that the other

9    case is set for a restitution hearing?

10            MR. ARNZEN:  Yes, Your Honor.

11            THE COURT:  What date is that, Tish?

12            THE CLERK:  It's the 24th, Your Honor.

13            THE COURT:  Of April?

14            THE CLERK:  May.

15            THE COURT:  May.

16            Mr. Scheper, May 24th at 9:00 for the restitution

17   hearing?

18            MR. SCHEPER:  Great, thank you.  I've got that.

19            THE COURT:  All right.

20     (The proceedings concluded at 10:40 a.m., March 31, 2021.)

21

22

23

24

25

COURT REPORTER'S CERTIFICATE

1

2

3      I, CYNTHIA R. OTT, Official Court Reporter, United States

4  District Court, Southern District of California, do hereby

5  certify that pursuant to 28 U.S.C. §753 the foregoing is a

6  true, complete and correct transcript of the stenographically

7  reported proceedings had in connection with the above-entitled

8  matter and that the transcript page format is in conformance

9  with the regulations of the Judicial Conference of the United

10  States.

11

12      DATED at San Diego, California, April 4, 2021.

13

14                    _____/s/ CYNTHIA R. OTT_____
                          CYNTHIA R. OTT, RDR, CRR
15

16

17

18

19

20

21

22

23

24

25